913 F.2d 1305
 UNITED STATES of America, Appellee,
v.
George DIXON a/k/a Willie Mack, Dick and Big Brother, Appellant.
Richard Hopkins and Gerald Hopkins-Bey, Intervenors.
UNITED STATES of America, Appellee,
v.
Nathaniel WILLIAMS a/k/a Nate, Appellant.
UNITED STATES of America, Appellee,
v.
Donald LEWIS, Appellant.
UNITED STATES of America, Appellee,
v.
Johnnie DENTMAN a/k/a Ace, Appellant.
UNITED STATES of America, Appellee,
v.
Delores BENNETT, Appellant.
UNITED STATES of America, Appellee,
v.
Noble BENNETT a/k/a Turtle a/k/a Little Brother, Appellant.
 Nos. 90-1766, 90-1792, 90-1821, 90-1835, 90-1836 and 90-1839.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 12, 1990.
Decided Sept. 12, 1990.
Rehearing Denied Nov. 14, 1990.
 
 Burton Shostak, St. Louis, Mo., for appellants.
 Mitchell Stevens, St. Louis, Mo., for appellee.
 Before McMILLIAN, ARNOLD and WOLLMAN, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 Defendants Noble Bennett, Delores Bennett, Johnnie Dentman, Donald Lewis, Willie Mack Dixon, Nathaniel Williams, Richard Hopkins, and Gerald Hopkins-Bey appeal from an order entered in the District Court for the Eastern District of Missouri denying their motions to dismiss an indictment pending against them after the district court declared a mistrial. For reversal defendants argue the district court failed to exercise its sound discretion in finding that "manifest necessity" justified declaration of a mistrial. For the reasons discussed below, we agree with the defendants and hold that the double jeopardy clause bars reprosecution of the defendants. Accordingly, we reverse the order of the district court and remand the case with directions to dismiss the indictment and discharge the defendants.
 
 
 2
 On April 21, 1989, a federal grand jury indicted some 35 individuals, including defendants, charging them with conspiracy to distribute heroin from 1984 to 1989, substantive drug offenses and tax offenses. Noble Bennett, the alleged ringleader of the conspiracy, was charged with one count of continuing criminal enterprise (21 U.S.C. Sec. 848), one count of conspiracy to distribute heroin (21 U.S.C. Sec. 846), two counts of distribution of heroin (21 U.S.C. Sec. 841), two counts of tax fraud (26 U.S.C. Secs. 7201, 7206(1)), and one count of conspiracy to commit tax fraud (18 U.S.C. Sec. 371). Delores Bennett was charged with one count of conspiracy to distribute heroin (21 U.S.C. Sec. 846), two counts of tax fraud (26 U.S.C. Secs. 7201, 7206(1)), and one count of conspiracy to commit tax fraud (18 U.S.C. Sec. 371). Willie Mack Dixon was charged with one count of continuing criminal enterprise (21 U.S.C. Sec. 848), one count of conspiracy to distribute heroin (21 U.S.C. Sec. 846), two counts of distribution of heroin (21 U.S.C. Sec. 841), three counts of tax fraud (26 U.S.C. Sec. 7206(1)), and one count of conspiracy to commit tax fraud (18 U.S.C. Sec. 371). Johnnie Dentman, Donald Lewis, Richard Hopkins, Gerald Hopkins-Bey, and Nathaniel Williams were each charged with one count of conspiracy to distribute heroin (21 U.S.C. Sec. 846).
 
 
 3
 The trial began on Monday, May 7, 1990. Jury selection began the next day, Tuesday, May 8, 1990. Jury selection was completed and the jury was sworn near the end of the business day, at about 5:15 p.m. The jury consisted of 7 African-American women and 5 white men; there were 4 white male alternates. All defendants are African-American. The district court instructed the jury not to discuss the case among themselves or with others and dismissed them. Due to the lateness of the hour, the district court did not give the jury complete opening instructions, which would have included an instruction cautioning the jury not to read news stories or articles about the case or to listen to radio or television news reports about the case.
 
 
 4
 Later that evening a local television station broadcast a news report about the case on the 10:00 o'clock news.[1] The news report stated that a jury had been empaneled in the Noble Bennett case and identified Noble Bennett as the "brains" of a multi-million dollar network responsible for the distribution of 80% of the "black tar" heroin in St. Louis. The news report also stated that authorities believed that Noble Bennett was responsible for a drug-related homicide. The news report also indicated that one possible government informant had been granted immunity for his involvement in two homicides and displayed a copy of the immunity letter. The news report further stated that the informant would testify that Noble Bennett had ordered a "hit" on the wife of another informant in an attempt to discourage that informant's testimony. The news report was repeated on the early morning (6:00 o'clock) news the next day, May 9, 1990.
 
 
 5
 One of the government case agents had videotaped the evening news report. At about 8:00 a.m. on Wednesday, May 9, 1990, the government attorney notified the district court of the news report. The district court viewed the videotape of the news report in the U.S. Attorney's office. Defense counsel had not been notified and were not present when the district court viewed the videotape. Court reconvened at about 9:40 a.m.; the jury was not present in the courtroom. The district judge announced that a local television station had broadcast a news report about the case, that he had viewed a videotape of the news report, that he found the news report to be extremely prejudicial to all defendants and the government, and sua sponte declared a mistrial. Counsel for two defendants made an express objection to the declaration of a mistrial; counsel for another defendant suggested that the district court question the jury. The district court noted the objection to the declaration of a mistrial on behalf of all defendants but refused to conduct a voir dire of the jury. The district court then dismissed the jury and ordered all parties to return on May 14, 1990, to select a new jury and to begin the second trial.
 
 
 6
 The district court filed its written findings of fact the next day. United States v. Bennett, No. S1-89-90CR(6) (E.D.Mo. May 10, 1990). The district court concluded that "manifest necessity" warranted the mistrial because the news report had "seriously and incurably" prejudiced Noble Bennett and the other defendants and the government. Slip op. at 3. The district court specifically noted that, due to the late hour on the first day of trial, no cautionary instruction warning the jury not to listen to or watch news reports had been given. Id. The district court also found that, based upon its own experience and observation of the voir dire, questioning the jury about the news report or giving the jury a cautionary instruction to disregard any news reports would not cure the prejudicial effect of the news report. Id. at 3-4. The district court did not elaborate on why polling the jurors or giving a cautionary instruction would not be sufficient to cure any possible prejudice. The defendants filed motions to dismiss the indictment on the ground that a second trial would be barred by the double jeopardy clause. The district court denied the motions to dismiss. The district court initially scheduled the second trial to begin on May 14, 1990, but then stayed further proceedings pending resolution of the double jeopardy issue on appeal. All defendants filed notices of appeal. We consolidated and expedited the appeals.
 
 APPELLATE JURISDICTION
 
 7
 We first consider whether we have appellate jurisdiction. Title 28 U.S.C. Sec. 1291 provides for appeal only from "final decisions" of the district courts. The final decision rule is particularly important in criminal proceedings:
 
 
 8
 Finality of judgment has been required as a predicate for federal appellate jurisdiction.... Adherence to this rule of finality has been particularly stringent in criminal prosecutions because "the delays and disruptions attendant upon intermediate appeal," which the rule is designed to avoid, "are especially inimical to the effective and fair administration of the criminal law."
 
 
 9
 Abney v. United States, 431 U.S. 651, 656-57, 97 S.Ct. 2034, 2038-39, 52 L.Ed.2d 651 (1977) (Abney ), citing DiBella v. United States, 369 U.S. 121, 126, 82 S.Ct. 654, 657, 7 L.Ed.2d 614 (1962). Despite the importance of finality, the Supreme Court has held that the denial of a defendant's motion to dismiss on double jeopardy grounds is appealable under the collateral order doctrine:
 
 
 10
 [Although the] pretrial denial of a motion to dismiss an indictment on double jeopardy grounds is obviously not "final" in the sense that it terminates the criminal proceedings in the district court ...[,] such pretrial orders fall within the so-called "collateral order" exception to the final-judgment rule first announced in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541 [69 S.Ct. 1221, 93 L.Ed. 1528] (1949), and are thus "final decisions" within the meaning of Sec. 1291.
 
 
 11
 Abney v. United States, 431 U.S. at 657, 97 S.Ct. at 2039; see Richardson v. United States, 468 U.S. 317, 321-22, 104 S.Ct. 3081, 3083-84, 82 L.Ed.2d 242 (1984) (Richardson ) (denial of motion to dismiss on double jeopardy grounds appealable under Cohen collateral order doctrine even when district court must review sufficiency of evidence in first trial). The Abney Court noted that "such orders constitute a complete, formal, and, in the trial court, final rejection of a criminal defendant's double jeopardy claim." 431 U.S. at 659, 97 S.Ct. at 2040. The Court also noted that "the very nature of a double jeopardy claim is such that it is collateral to, and separable from, the principal issue at the accused's impending criminal trial, i.e., whether or not the accused is guilty of the offense charged." Id. Finally, the Court noted, "the rights conferred on a criminal accused by the Double Jeopardy Clause would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence." Id. at 660, 97 S.Ct. at 2040-41. This is because "the Double Jeopardy Clause protects an individual against more than being subjected to double punishments. It is a guarantee against being twice put to trial for the same offense." Id. at 660-61, 97 S.Ct. at 2041 (emphasis in original; footnote omitted). Compare United States v. MacDonald, 435 U.S. 850, 861, 98 S.Ct. 1547, 1553, 56 L.Ed.2d 18 (1978) (order denying motion to dismiss based on right to speedy trial not final collateral order).
 
 
 12
 In addition, "a district court's order denying a defendant's motion to dismiss based on a claim of double jeopardy is appealable only if a colorable claim is made." United States v. Grabinski, 674 F.2d 677, 678 (8th Cir.) (banc) (per curiam) (Grabinski ), cert. denied, 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 67 (1982). See Richardson, 468 U.S. at 322, 104 S.Ct. at 3084 ("we have indicated that the appealability of a double jeopardy claim depends upon its being at least 'colorable' ") (citation omitted). In Grabinski, we requested the district courts, as a matter of practice whenever a motion to dismiss an indictment on double jeopardy grounds is denied, to make written findings on the issue of whether the motion is frivolous or non-frivolous. Id. at 679. In the present case the district court did not make an express finding that the motions to dismiss based on double jeopardy grounds were non-frivolous. However, in the present case, unlike in Grabinski, the record clearly shows that jeopardy had attached in the first trial because the jury had been empaneled and sworn. "[J]eopardy attaches when a jury is empaneled and sworn, or, in a bench trial, when the judge begins to receive evidence." United States v. Martin Linen Supply Co., 430 U.S. 564, 569, 97 S.Ct. 1349, 1353, 51 L.Ed.2d 642 (1977). We therefore conclude that the defendants' double jeopardy claims are not frivolous and that we have appellate jurisdiction.
 
 DOUBLE JEOPARDY
 
 13
 The fifth amendment of the United States Constitution provides in relevant part that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." The origins of the double jeopardy clause "can be traced to Greek and Roman times, and it became established in the common law of England long before this Nation's independence." Benton v. Maryland, 395 U.S. 784, 795, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969) (footnote omitted). The protection against double jeopardy has been recognized as " 'fundamental to the American scheme of justice.' " Id. at 796, 89 S.Ct. at 2063 (citing Duncan v. Louisiana, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968)). "The right not to be placed in jeopardy more than once for the same offense is a vital safeguard in our society.... If such great constitutional protections are given a narrow, grudging application they are deprived of much of their significance." Green v. United States, 355 U.S. 184, 198, 78 S.Ct. 221, 229, 2 L.Ed.2d 199 (1957) (Green ).
 
 
 14
 "The Fifth Amendment's prohibition against placing a defendant 'twice in jeopardy' represents a constitutional policy of finality for the defendant's benefit in federal criminal proceedings." United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971) (plurality opinion) (footnote omitted). In addition to its status as a constitutional imperative, the prohibition against double jeopardy is supported by sound policies of fairness:
 
 
 15
 The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting [the defendant] to embarrassment, expense and ordeal and compelling [the defendant] to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent [the defendant] may be found guilty.
 
 
 16
 Green, 355 U.S. at 187-88, 78 S.Ct. at 223.
 
 
 17
 Not only does the double jeopardy clause protect a defendant against the embarrassment, expense, and ordeal of retrial after an acquittal or conviction, it also protects the defendant's "valued right" to have his or her trial resolved by the particular tribunal he or she has chosen:
 
 
 18
 Because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's "valued right to have [the] trial completed by a particular tribunal." The reasons why this "valued right" merits constitutional protection are worthy of repetition. Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which [the accused] is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.
 
 
 19
 Arizona v. Washington, 434 U.S. 497, 503-05, 98 S.Ct. 824, 829-30, 54 L.Ed.2d 717 (1978) (Washington ) (footnotes omitted).
 
 
 20
 The protection afforded by the double jeopardy clause varies depending on whether or not there has been a final resolution of the merits of the charges against the accused. On the one hand, the double jeopardy clause unequivocally prohibits reprosecution for the same offense after a final judgment of conviction or acquittal. See Washington, 434 U.S. at 504-05, 98 S.Ct. at 829-30. Thus, an "acquitted defendant may not be retried even though 'the acquittal was based upon an egregiously erroneous foundation.' " Id. at 503, 98 S.Ct. at 829 (citation omitted). On the other hand, "retrial is not automatically barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused." Id. at 505, 98 S.Ct. at 830. Whether the double jeopardy clause bars retrial after a mistrial requires balancing the defendant's valued right to have his or her trial completed by a particular tribunal against the public's interest in affording the prosecutor one complete opportunity to convict those who violated its laws:
 
 
 21
 Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, [the] valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present [the prosecution's] evidence to an impartial jury. Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if [the prosecutor] is to avoid the double jeopardy bar. [The prosecutor's] burden is a heavy one. The prosecutor must demonstrate "manifest necessity" for any mistrial declared over the objection of the defendant.
 
 
 22
 Id. at 505, 98 S.Ct. at 830 (footnote omitted).
 
 
 23
 The issue we must decide in this case is whether "manifest necessity" warranted the district court's sua sponte declaration of a mistrial.[2] If manifest necessity required the declaration of a mistrial, then the defendants may be retried without violating their protection against double jeopardy. The "manifest necessity" doctrine was first stated by Justice Story in United States v. Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824):
 
 
 24
 We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with greatest caution, under urgent circumstances, and for very plain and obvious causes....
 
 
 25
 The Supreme Court has repeatedly refused to define "manifest necessity" more precisely, explaining that "those words do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge." Washington, 434 U.S. at 506, 98 S.Ct. at 830 (footnote omitted); see Illinois v. Somerville, 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973) (Somerville ). The Court has cautioned that "necessity" cannot be interpreted literally; what is required is a "high degree" of necessity before concluding that a mistrial is appropriate. Washington, 434 U.S. at 506-09, 98 S.Ct. at 830-32.
 
 
 26
 Whether the requisite "high degree of necessity" for declaration of a mistrial has been reached in a particular trial is difficult to evaluate. See, e.g., United States v. Crotwell, 896 F.2d 437, 440 (10th Cir.1990) (degree of appellate scrutiny will vary depending upon circumstances). At one extreme, "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." Washington, 434 U.S. at 508, 98 S.Ct. at 832 (footnotes omitted). In comparison, "[a]t the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial." Id. at 509, 98 S.Ct. at 832 (footnote omitted). Because possible juror bias falls nearer to the deadlocked jury end of the spectrum of trial problems which may warrant a mistrial, the district court's decision to declare a mistrial on that ground is entitled to "great deference." Id. at 512-14, 98 S.Ct. at 833-35 (discussing cases involving improper opening statement, juror acquainted with defendant, trial juror who served on grand jury).
 
 
 27
 Thus, we must uphold the district court's finding of "manifest necessity" for the sua sponte declaration of a mistrial if, upon review of the entire record, we are satisfied the district court exercised its "sound discretion" in making that determination. Id. at 514, 98 S.Ct. at 834. What we seek is assurance on the record that the district court, in declaring a mistrial, acted "responsibly and deliberately, and accorded careful consideration to [the defendants'] interest in having the trial concluded in a single proceeding." Id. at 516, 98 S.Ct. at 835; see United States v. Jorn, 400 U.S. at 485, 91 S.Ct. at 557 (Perez doctrine commands "scrupulous exercise of judicial discretion"); United States v. Bauman, 887 F.2d 546, 550-51 & n. 8 (5th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1128, 107 L.Ed.2d 1034 (1990). "Manifest necessity" can appear on the basis of the record as a whole; the trial judge does not have to make an explicit finding of "manifest necessity" or expressly state that particular alternatives were considered and rejected. Washington, 434 U.S. at 516-17, 98 S.Ct. at 835-36. However, consultation with counsel and consideration of available alternatives are consistent with the exercise of sound discretion. See, e.g., Lovinger v. Circuit Court, 845 F.2d 739, 745 (7th Cir.), cert. denied, 488 U.S. 851, 109 S.Ct. 136, 102 L.Ed.2d 108 (1988); Grandberry v. Bonner, 653 F.2d 1010, 1015 (5th Cir.1981); Parker v. United States, 507 F.2d 587, 589 (8th Cir.1974) (Parker ), cert. denied, 421 U.S. 916, 95 S.Ct. 1576, 43 L.Ed.2d 782 (1975). "A precipitate decision, reflected by a rapid sequence of events culminating in a declaration of mistrial, would tend to indicate insufficient concern for the defendant's constitutional protection." Brady v. Samaha, 667 F.2d 224, 229 (1st Cir.1981). See Washington, 434 U.S. at 515-16, 98 S.Ct. at 835 (analyzing whether district court acted precipitately in declaring mistrial).
 
 
 28
 We address the government's reversible trial error argument first. The government argues that the district court had no choice but to declare a mistrial because, had the trial proceeded and the defendants been found guilty, the convictions would have been reversed on appeal because of the district court's failure to caution the jury not to read news stories or articles about the case, or to listen to radio or television news reports about the case, citing United States v. Williams, 635 F.2d 744 (8th Cir.1980) (Williams ). See Somerville, 410 U.S. at 464, 93 S.Ct. at 1070 (automatically reversible error is grounds for declaring mistrial). In Williams, the case was submitted to the jury about 5:05 p.m. after a one-day trial. The jury deliberated for about an hour and then reported that it was hopelessly deadlocked. The government and the defense attorney requested that the jury continue their deliberations. At about 7:30 p.m., at the request of the jury, the district court sent the jury home. The district court did not admonish the jury not to discuss the case outside the jury room. The next morning the jury resumed their deliberations and, after about 25 minutes, returned a guilty verdict. On appeal the defendant challenged the district court's failure to admonish the jury. There was no record that a cautionary instruction had been given to the jury at any time before the jury began hearing the evidence, or before recess, lunch, or separation. We held that it was reversible error to allow the deadlocked jury "to separate over night without any admonition to keep their deliberations secret and refrain from having outside communication concerning the case with one another or with others." Id. at 746 (emphasis added).
 
 
 29
 There are two difficulties with the government's argument that the district court's failure to admonish the jurors constituted a fatal legal defect that justified the declaration of a mistrial. First, in the present case the district court did not base its decision to declare a mistrial solely upon the failure to caution the jury to avoid news reports about the case. The district court declared a mistrial because of possible juror bias as a result of the news report about the case. However, despite its concern with possible juror bias, the district court refused to question the jurors to ascertain if any of them had actually watched the news report. Second, and more important, we think this case is distinguishable from Williams. Here, the jury was released immediately after being sworn but before any evidence had been presented. This is not a case like Williams, in which the jury was released in the midst of their deliberations. The period of jury deliberation is the time of highest risk of improper outside influence. See, e.g., United States v. Richardson, 260 U.S.App.D.C. 163, 817 F.2d 886, 889 (1987). In addition, unlike Williams, this is not a case in which the jury was released without ever having been admonished at all. See United States v. Richardson, 817 F.2d at 888-90 (failure to repeat admonition before overnight recess during deliberation held not reversible error); United States v. Weatherd, 699 F.2d 959, 962 (8th Cir.1983) (failure to admonish jury before overnight recess during deliberation held not reversible error; jury properly cautioned on 13 prior occasions). Williams itself acknowledges that the failure to caution the jury before separation may be harmless error. See 635 F.2d at 746, citing Morrow v. United States, 408 F.2d 1390, 1392 (8th Cir.1969). In the present case, although no specific instruction was given about avoiding news reports concerning the case, the district court did caution the jury not to discuss the case among themselves or with others or to allow anyone to talk to them about the case. The district court also specifically instructed the jury to inform the court if anyone attempted to talk to any of them about the case. The record also indicates that the district court admonished the venire twice during voir dire before recesses, although the admonition itself is not reported. For these reasons, we think the failure to instruct the jury to avoid news reports was not in itself automatically reversible error and thus cannot justify the declaration of the mistrial over the objections of the defendants.[3]
 
 
 30
 We turn now to the principal argument on appeal. The defendants argue the district court did not exercise its sound discretion in declaring a mistrial and should not be entitled to special deference on appeal. The defendants argue that the district court had already decided to declare a mistrial when court reconvened and did not seriously consider less drastic alternatives to declaring a mistrial. The defendants also argue that there was no manifest necessity for the declaration of a mistrial. They argue that there had been extensive pre-trial publicity about the investigation and the nature and scope of the defendants' alleged criminal activity. They note that both the pre-trial publicity and the fact that some of the government witnesses would be testifying pursuant to grants of immunity or pursuant to plea agreements had already been made known to the jury during voir dire. In response, the government argues the district court did exercise sound discretion and, therefore, the decision of the district judge, who is most familiar with the proceedings and with the background of the case on trial, to declare a mistrial based on possible juror bias is entitled to great deference on appeal.
 
 
 31
 We have carefully reviewed the record and the district court's findings of fact. We conclude that the record indicates that the district court's declaration of a mistrial in the present case was not the result of a scrupulous exercise of judicial discretion. Instead, the district court acted, most uncharacteristically, in an abrupt and precipitate manner. Under these circumstances, the reason for special deference by the appellate court disappears and close appellate scrutiny is appropriate. See Washington, 434 U.S. at 510 n. 28, 98 S.Ct. at 832-33 n. 28.
 
 
 32
 The district court began the second day of trial by announcing that he had reviewed the videotape of the news report, found the news report was extremely prejudicial, and then immediately declared a mistrial. There is no record of what the government attorney told the district court about the news report earlier that morning. The district court did not consult the defense attorneys before declaring a mistrial. In response to an objection to the declaration of a mistrial by one of the defendants' attorneys, the district court replied, "[o]f course you will [object], but I don't care whether you do or not." Transcript of Proceedings at 219, No. S1-89-90 CR(6) (E.D.Mo. May 9, 1990). The defense attorneys therefore did not have an opportunity to explain their objections or to suggest any less drastic alternatives to preserve the defendants' "valued right" before the district court declared a mistrial. There was no opportunity for discussion of any kind. The district court dismissed the jury after summarily rejecting a defense suggestion to poll the individual jurors as to whether or not they had seen or heard the news report. The precipitous nature of the district court's decision and the rapid sequence of events that culminated in the declaration of a mistrial indicate that the district court could not have given adequate consideration to the defendants' important interest in "being able, once and for all, to conclude [their] confrontation with society through the verdict of a tribunal [they] might believe to be favorably disposed to [their] fate." United States v. Jorn, 400 U.S. at 486, 91 S.Ct. at 558. See, e.g., United States v. Ramirez, 884 F.2d 1524, 1529-30 (1st Cir.1989) (no opportunity for defense objection or discussion, no consideration of available alternatives); Lovinger v. Circuit Court, 845 F.2d at 746 (same); Grandberry v. Bonner, 653 F.2d at 1016 (same), citing United States v. Starling, 571 F.2d 934, 941 (5th Cir.1978); see also Parker, 507 F.2d at 589 (importance of consideration of alternatives to mistrial).
 
 
 33
 We do not minimize the potential for prejudice to the defendants and to the government as a result of the news report. The district court's dismay over the unauthorized disclosure of the immunity letter and the news report itself was understandable. We also appreciate the logistical difficulties and other constraints the district court faced in trying this case. Nevertheless, the declaration of a mistrial is a "very drastic remedy." United States v. Elem, 845 F.2d 170, 172 (8th Cir.1988). This circuit has instructed district courts on the proper approach to follow when confronted with potentially adverse trial publicity:
 
 
 34
 Whenever it appears during the course of a trial that the members of the jury may have been exposed to publicity which is adverse to the defendant, the trial judge must make an initial determination as to whether the publicity creates a danger of substantial prejudice to the accused. If the trial judge determines that it does, the jurors should then be polled individually to determine whether they have in fact been exposed to the prejudicial information. If any jurors have been so exposed, the trial judge must ascertain the extent and effect of the infection, and what measures, including the possible declaration of a mistrial, must be taken to protect the rights of the accused.
 
 
 35
 United States v. Hood, 593 F.2d 293, 296 (8th Cir.1979) (Hood ) (citations omitted). We have frequently upheld the decisions of district courts on whether or not to grant a mistrial when they have properly applied the Hood factors and polled the jury. See, e.g., United States v. Krevsky, 741 F.2d 1090, 1093 (8th Cir.1984) (because district court properly followed Hood procedures, mistrial was not required to protect the defendants' right to a fair trial); United States v. Burchinal, 657 F.2d 985, 996-97 (8th Cir.), cert. denied, 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981) (district court's refusal to declare a mistrial not reversible error when court polled jurors to see if any of them had seen trial publicity and determined that the three jurors who had read news accounts could remain impartial).
 
 
 36
 In the present case, the district court could have taken a recess and consulted with the government and defense attorneys about how to determine whether any of the jurors had watched or heard about the news report and the extent of any taint. Depending upon the number of "tainted" jurors, it might have been possible to replace them with alternates. In its findings of fact, the district court held that polling the jurors or giving a cautionary instruction would not cure the prejudicial effect of the news report. Slip op. at 3. However, because the district court refused to allow any inquiry of the jurors, there is no record on this issue and any assessment of the degree of prejudicial taint and the possibility of cure is necessarily speculative. Cf. Simmons v. United States, 142 U.S. 148, 154, 12 S.Ct. 171, 172, 35 L.Ed. 968 (1891) (retrial not barred after mistrial where one of jurors knew defendant and prejudicial newspaper publicity had actually been read by jurors); Parker, 507 F.2d at 588-89 ("manifest necessity" existed for declaration of mistrial where prejudicial publicity had actually been heard and reported by a juror).
 
 
 37
 Moreover, any prejudicial impact of the news report on the defendants may have been minimal because much of the background information about the Bennett organization in the news report had been extensively reported in earlier reports in both the electronic and print media. The fact of the pre-trial publicity was also raised and discussed during voir dire. As evidenced by their objections to the declaration of a mistrial, the defendants were willing to proceed with the jury despite the possible prejudicial impact of the news report. The news report did refer to the possibility that the government's case would include witnesses who would testify pursuant to grants of immunity or pursuant to plea agreements. Although the specific information that one government witness had been granted immunity for two homicides had not been mentioned during voir dire, any prejudicial impact on the government would probably have been negligible because information about the grants of immunity and plea agreements had already been raised and thoroughly discussed during voir dire. The district court could have also considered granting a severance. Because the news report focused upon defendant Noble Bennett and mentioned him by name, it might have been possible to continue the trial as to the remaining defendants.
 
 
 38
 Finally, we note that considerations of judicial economy implicit in the district court's finding that this incident had occurred on the very first day of what was expected to be a four-to-six-week trial (slip op. at 3) cannot outweigh the defendants' " 'valued right' to have [their] trial completed by the first jury that was empaneled and sworn." United States v. Crotwell, 896 F.2d at 440-41, citing Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949); cf. United States v. Ramirez, 884 F.2d at 1530 (cost of two trials was not compelling reason to deny severance); United States v. Bridewell, 664 F.2d 1050, 1051 (6th Cir.1981) (per curiam) (same).
 
 
 39
 We discharge our constitutional duty with solemnity and full recognition that one or more of the defendants may indeed be guilty of the serious offenses charged in their respective indictments. To paraphrase Justice Harlan, we release the defendants not "because we like to do so, or because we think it wise to do so, but only because" the Constitution requires us to do so. See Desist v. United States, 394 U.S. 244, 258, 89 S.Ct. 1030, 1039, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting). While it is regrettable when serious charges of criminal conduct go untried, such a result is necessary in this case to protect the right of all citizens not to be twice put in jeopardy for the same offense, a right "that was dearly won and one that should continue to be highly valued." Green, 355 U.S. at 198, 78 S.Ct. at 229. Despite the heavy price that vindication of our constitutional liberties occasionally exacts on society, we are confident that it is one that is worth paying because the treasured freedoms guaranteed in the Bill of Rights must be upheld in individual cases in order to be secured for the enjoyment of all. Accordingly, we conclude there was no manifest necessity for the mistrial and hold that the double jeopardy clause of the fifth amendment bars reprosecution of the defendants. We reverse the order of the district court and remand the case with directions to dismiss the indictment and discharge the defendants.
 
 
 
 [1]
 A videotape of the news report is Exhibit No. 1
 
 
 [2]
 We note that the "manifest necessity" test does not apply when the defendant has requested or consented to a mistrial. See Oregon v. Kennedy, 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982). "[W]here circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution...." United States v. Jorn, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (Jorn ). In the present case, the "manifest necessity" test is the governing legal standard because the mistrial was declared over the express objection of the defendants
 
 
 [3]
 In Illinois v. Somerville, 410 U.S. 458, 464, 93 S.Ct. 1066, 1070, 35 L.Ed.2d 425 (1973) (Somerville ), the Supreme Court held that a fatal legal defect in the indictment justified the declaration of a mistrial over the defendant's objection because the defect was "an obvious procedural error ... [that] would make reversal on appeal a certainty." The Court noted that under Illinois law, the defect in the indictment deprived Illinois courts of jurisdiction and could not be cured by amendment, id. at 468, 93 S.Ct. at 1072, or waived by the defendant's failure to object, id. at 460, 93 S.Ct. at 1068. Somerville is not apposite to the present case because the district court's failure to admonish the jury is not an obvious procedural error that makes reversal on appeal a certainty. See, e.g., United States v. Weatherd, 699 F.2d 959, 962 (8th Cir.1983). The failure to admonish can be deemed merely harmless error. Morrow v. United States, 408 F.2d 1390, 1392 (8th Cir.1969). Somerville is distinguishable for a second reason. In Somerville, the defendant could not waive the jurisdictional defect in the indictment as a matter of law. 410 U.S. at 460, 93 S.Ct. at 1068. In contrast, nothing in the record of the present case indicates that the defendants were precluded from waiving the district court's failure to admonish the jurors in order to vindicate their "valued right" to have their cases decided by the first tribunal it had chosen. The defendants herein were deprived of their rights "to retain primary control of the course to be followed" after the district court failed to admonish the jury and the allegedly prejudicial news report was broadcast. See United States v. Dinitz, 424 U.S. 600, 609, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976). Even assuming that the failure to caution the jury prejudiced the defendants' prospects of securing acquittals, they "may nonetheless [have] desire[d] 'to go to the first jury and, perhaps, end the dispute then and there with ... acquittal[s]." Id. at 608, 96 S.Ct. at 1080, citing Jorn, 400 U.S. at 484, 91 S.Ct. at 556. Somerville therefore lends no support to the government's argument that a fatal legal defect justified the declaration of a mistrial in the present case