# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-4397
_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Robert Lee Weaselhead, Jr., | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  April 16, 1998

Filed:   September 9, 1998
_____

Before WOLLMAN, BEAM, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Robert Lee Weaselhead, Jr. appeals from an order by the district court denying his amended motion to dismiss the superseding indictment returned against him.  He contends that Count III of the indictment offends the Double Jeopardy Clause of the Fifth Amendment.  We reverse.

## I.

Weaselhead is an adult Indian male and an enrolled member of the Blackfeet Indian Tribe of Montana. Although he now lives in Nebraska, he is not a member of the Winnebago Tribe domiciled in that state. In the early months of 1997, Weaselhead, then nineteen years old, entered into a sexual relationship with his fourteen-year-old girlfriend, a member of the Winnebago Tribe. This relationship was brought to the attention of tribal authorities. On March 20, 1997, Weaselhead was arraigned in Winnebago Tribal Court on charges of sexual assault, contributing to the delinquency of a minor, criminal trespass, and child abuse. Although the tribe was apparently aware that Weaselhead and the girl had engaged in sexual acts on more than one occasion, the indictment only charged conduct alleged to have occurred on March 15, 1997. Weaselhead's attorney negotiated a plea agreement with the tribal prosecutor. Pursuant to that agreement, Weaselhead pled no contest to one count of first degree sexual assault. The remaining charges were then dismissed. The tribal court entered a judgment of conviction and sentenced Weaselhead to, *inter alia*, 280 days in jail, 100 of which were suspended.

The same day that Weaselhead entered his plea in tribal court, he was indicted by a federal grand jury on a charge of engaging in a sexual act with an Indian female juvenile in violation of 18 U.S.C. §§ 2243 and 1153 (1997). He pled not guilty and moved to dismiss the indictment on double jeopardy grounds. The grand jury subsequently returned a superseding indictment, which charged three separate counts of sexual abuse. Counts I and II charged conduct occurring on February 27 and March 1, 1997, respectively. Count III charged sexual contact that occurred on March 15, the same incident that had resulted in Weaselhead's earlier conviction in tribal court.

Weaselhead then moved to dismiss each count. The magistrate judge submitted a report recommending that the motion be granted and the indictment dismissed on double jeopardy grounds, concluding that:

> [t]he dual prosecution of the defendant by both the tribal court and now the federal government does not implicate separate prosecutions by separate sovereigns. Rather, the tribal court was exercising jurisdiction over the defendant which flowed from a delegation of power from Congress and a subsequent prosecution by the federal government for the same offense is barred by the Fifth Amendment.

Report and Recommendation at 9. The government objected. Holding that the Double Jeopardy Clause was not implicated because the dual prosecution of Weaselhead was undertaken by separate sovereigns, the district court sustained the government's objections and denied the motion to dismiss.

In this appeal brought pursuant to 28 U.S.C. § 1291, Weaselhead concedes the constitutional propriety of Counts I and II of the superseding indictment and challenges only the denial of his amended motion to dismiss Count III as a violation of double jeopardy. Our review is de novo. See United States v. Basile, 109 F.3d 1304, 1306 (8th Cir.), cert. denied, 118 S. Ct. 189 (1997).

## II.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." Protection from double jeopardy is a vital safeguard that is "fundamental to the American scheme of justice." United States v. Dixon, 913 F.2d 1305, 1309 (8th Cir. 1990) (quoting Benton v. Maryland, 395 U.S. 784, 796 (1969)). "If such great constitutional protections are given a narrow, grudging application they are deprived of much of their significance." Dixon, 913 F.2d at 1309 (quoting Green v. United States, 355 U.S. 184, 198 (1957)).

The doctrine of dual sovereignty permits successive prosecutions by independent sovereigns based upon the same conduct. Because "each sovereign derives its power from a different constitutional source, . . . both may prosecute and punish the same individual for the same act." Basile, 109 F.3d at 1307; see also Abbate v. United States, 359 U.S. 187, 193-96 (1959). Dual sovereignty principles are inapplicable, however, when the authority of two entities to prosecute an individual emanates from the same overriding sovereign. See, e.g., Waller v. Florida, 397 U.S. 387, 393-95 (1970) (holding that city and state in which it was political subdivision could not bring successive prosecutions for same unlawful conduct despite fact that state law treated them as separate sovereigns); Puerto Rico v. Shell Co., 302 U.S. 253, 264-66 (1937) (holding that successive prosecutions by federal and territorial courts are impermissible because such courts are "creations emanating from the same sovereignty"); Grafton v. United States, 206 U.S. 333, 351-55 (1907) (holding that soldier acquitted of murder by federal court-martial could not be retried for same offense by territorial court in Philippines). Thus, application of the dual sovereignty exception "turns on whether the two entities draw their authority to punish the offender from distinct sources of power." Heath v. Alabama, 474 U.S. 82, 88 (1985); see also United States v. Sanchez, 992 F.2d 1143, 1149-50 (11th Cir. 1993).

In United States v. Wheeler, 435 U.S. 313, 314 (1978), the question was whether the Double Jeopardy Clause barred prosecution of an Indian in federal court after he had been convicted in tribal court of a lesser included offense arising out of the same incident.[1] The Court framed the issue as follows:

> It is undisputed that Indian tribes have power to enforce their criminal laws against tribe members. Although physically within the territory of

---

[1]Prior to Wheeler, we had held that the Double Jeopardy Clause did not bar successive tribal and federal prosecutions of a tribe member for the same offense, creating a division of authority among the circuits. See United States v. Walking Crow, 560 F.2d 386, 388-89 (8th Cir. 1977); Wheeler, 435 U.S. at 316 n.6.

the United States and subject to ultimate federal control, they nonetheless remain "a separate people, with the power of regulating their internal and social relations." Their right of internal self-government includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions. . . . [T]he controlling question in this case is the source of this power to punish tribal offenders: Is it a part of inherent tribal sovereignty, or an aspect of the sovereignty of the Federal Government which has been delegated to the tribes by Congress?

Id. at 322 (citations omitted). Thus, if the power to punish tribe members emanated from the tribe's inherent sovereignty, double jeopardy would not be implicated by a subsequent federal prosecution for the same conduct. However, if the ultimate source of power was "an aspect of the sovereignty of the Federal Government which [had] been delegated to the tribes by Congress," the Double Jeopardy Clause would bar a subsequent federal prosecution. Id.; see also Heath, 474 U.S. at 90-91.

The Court held that an Indian tribe's criminal jurisdiction over its members emanates from its inherent sovereign powers:

[T]he sovereign power of a tribe to prosecute its members for tribal offenses clearly does not fall within that part of sovereignty which the Indians implicitly lost by virtue of their dependent status. The areas which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe. Thus, Indian tribes can no longer freely alienate to non-Indians the land they occupy. They cannot enter into direct commercial or governmental relations with foreign nations. And, as we have recently held, they cannot try nonmembers in tribal courts. These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations. But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve only the relations

-5-

among members of a tribe. Thus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status.

Wheeler, 435 U.S. at 325-26 (citations omitted) (emphasis supplied). The Court therefore concluded:

> [T]he power to punish offenses against tribal law committed by Tribe members, which was part of the Navajos' primeval sovereignty, has never been taken away from them, either explicitly or implicitly, and is attributable in no way to any delegation to them of federal authority. It follows that when the Navajo Tribe exercises this power, it does so as part of its retained sovereignty and not as an arm of the Federal Government.

Id. at 328. As a result, when successive prosecutions of a tribe member are brought in tribal court and federal court, double jeopardy principles are not offended. See id. at 329-30; Heath, 474 U.S. at 90-91.

This case presents the necessary corollary to the holding in Wheeler. Here, the "controlling question . . . is the source of [the] power to punish" nonmembers of the tribe whose racial status is nonetheless Indian. 435 U.S. at 322. Thus, we must determine whether the source of such power is "a part of inherent tribal sovereignty, or an aspect of the sovereignty of the Federal Government which has been delegated to the tribes by Congress." Id.

## III.

By virtue of their status as the aboriginal peoples of this continent, Indian tribes retain certain incidents of their preexisting inherent sovereignty. Among these is the right to internal self-government, which "includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions." Id. The Supreme

Court has interpreted the Indian Commerce Clause as granting Congress a "plenary power to legislate in the field of Indian affairs." Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192 (1989); see U.S. CONST. art. I, § 8, cl. 3. Thus, "[t]he sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance." Wheeler, 435 U.S. at 323; see also United States v. Wadena, No. 96-4141, slip op. (8th Cir. Aug. 11, 1998).

In Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 195 (1978), the Supreme Court held that Indian tribal courts do not have inherent criminal jurisdiction over non-Indians and therefore cannot assume such jurisdiction, at least not without specific legislative authorization to do so. As explained by the Court:

> [T]he tribes' retained powers are not such that they are limited only by specific restrictions in treaties or congressional enactments. . . . Upon incorporation into the territory of the United States, the Indian tribes thereby come under the territorial sovereignty of the United States and their exercise of separate power is constrained so as not to conflict with the interests of this overriding sovereignty. "[T]heir rights to complete sovereignty, as independent nations, [are] necessarily diminished."

Id. at 208-09 (alterations in original) (citation omitted); see also Wheeler, 435 U.S. at 322-26 (discussing organic law doctrine of "implicit divestiture of sovereignty"). As a result, the Court concluded, "an examination of our earlier precedents satisfies us that, even ignoring treaty provisions and congressional policy, Indians do not have criminal jurisdiction over non-Indians absent affirmative delegation of such power by Congress." Oliphant, 435 U.S. at 208; see also Montana v. United States, 450 U.S. 544, 565 (1981) (recognizing "general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe").

In Duro v. Reina, 495 U.S. 676, 685 (1990), the Court confirmed its earlier statements that, at least in criminal matters, a tribe's inherent sovereign powers extend only to tribe members, irrespective of an individual's racial status as an Indian.[2] It recognized that when a criminal prosecution reflects a "manifestation of external relations between the Tribe and outsiders," including nonmember Indians, such jurisdiction is necessarily "inconsistent with the Tribe's dependent status, and could only have come to the Tribe by delegation from Congress." Id. at 686. Importantly, any such congressional delegation of power is "subject to the constraints of the Constitution." Id. This is so because "[t]he exercise of criminal jurisdiction subjects a person not only to the adjudicatory power of the tribunal, but also to the prosecuting power of the tribe, and involves a far more direct intrusion on personal liberties." Id. at 688. Because all Indians are also full citizens of the United States, such an intrusion necessarily implicates "constitutional limitations," including the "fundamental basis for power within our constitutional system" that authority to govern is derived from "the consent of the governed." Id. at 693-94.

> Criminal trial and punishment is so serious an intrusion on personal liberty that its exercise over non-Indian citizens was a power necessarily surrendered by the tribes in their submission to the overriding sovereignty of the United States. [citation omitted]. We hesitate to adopt a view of tribal sovereignty that would single out another group of citizens, nonmember Indians, for trial by political bodies that do not include them. As full citizens, Indians share in the territorial and political sovereignty of the United States. The retained sovereignty of the tribe is but a recognition of certain additional authority the tribes maintain over Indians who consent to be tribal members. Indians like all other citizens share allegiance to the overriding sovereign, the United States. A tribe's

---

[2]The Duro decision confirmed our prior holding that tribal courts are without criminal jurisdiction over nonmembers, including nonmember Indians. See Greywater v. Joshua, 846 F.2d 486, 493 (8th Cir. 1988) ("We thus conclude that the Tribe's authority to prosecute nonmember Indians is nonexistent").

additional authority comes from the consent of its members, and so in the criminal sphere membership marks the bounds of tribal authority.

Id. at 693. Thus, "the sovereignty retained by the tribes in their dependent status within our scheme of government," does not include "the power of criminal jurisdiction over nonmembers." Id. at 684. Instead, the fundamental status of an Indian who is not a member of the tribe that seeks to prosecute him is identical to that of a non-Indian. See id. at 693.

Congress responded to Duro by amending the Indian Civil Rights Act (ICRA), 25 U.S.C. §§ 1301-03 (1983 & Supp. 1998).[3] The amendment redefined the statute's definition of "powers of self-government" to include "the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians." 25 U.S.C. § 1301(2). It also created a definition of "Indian," as "any person who would be subject to the jurisdiction of the United States as an Indian under section 1153 of Title 18 if that person were to commit an offense listed in that section in Indian country to which that section applies." 25 U.S.C. § 1301(4).

These post-Duro amendments reflect an attempt by Congress to rewrite the fundamental principles upon which Duro, Oliphant, and Wheeler were based by redefining the Indian tribes' "inherent" sovereign status as having always included criminal jurisdiction over nonmember Indians.[4] Thus, we are presented with a

---

[3]The amendment was initially effective only through September 30, 1991, but was subsequently enacted as a permanent measure. See Pub. L. No. 101-511, § 8077, 104 Stat. 1856, 1892-93 (1990) (codified at 25 U.S.C. § 1301(2), (4)); Pub. L. No. 102-137, § 1, 105 Stat. 646 (1991) (codified at 25 U.S.C. § 1301(2), (4)).

[4]Weaselhead concedes, and we agree, that Congress's intent to do so is plain from the legislative history. See Mousseaux v. United States Comm'r of Indian Affairs, 806 F. Supp. 1433, 1441-43 (D.S.D. 1992), aff'd in part and remanded in part on other grounds, 28 F.3d 786 (8th Cir. 1994) (detailing legislative history of post-Duro amendments and intent of Congress to thereby create "legal fiction" that Duro was

legislative enactment purporting to recast history in a manner that alters the Supreme Court's stated understanding of the organizing principles by which the Indian tribes were incorporated into our constitutional system of government.  The question we must address, then, is whether the amendment's authorization of criminal jurisdiction over nonmember Indians is, as Congress asserted, simply a non-substantive "recognition" of inherent rights that Indian tribes have always held or whether it constitutes an affirmative delegation of power.

The Supreme Court has not yet had occasion to directly construe the post-<u>Duro</u> revision of the ICRA.  However, in <u>South Dakota v. Bourland</u>, 508 U.S. 679, 694-95 (1993), issued after the changes had been enacted and permanently codified, the Court once again affirmed the principle that jurisdiction of an Indian tribe over nonmembers of the tribe, irrespective of race, is neither inherent nor sovereign, and is not possible absent an affirmative delegation of power from Congress:

> The dissent's complaint that we give "barely a nod" to the Tribe's inherent sovereignty argument is simply another manifestation of its disagreement with <u>Montana</u>, which announced "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," 450 U.S., at 565, 101 S. Ct., at 1258.  While the dissent refers to our "myopic focus" on the Tribe's prior treaty right to "absolute and undisturbed use and occupation" of the taken area, it shuts both eyes to the reality that after <u>Montana</u>, tribal sovereignty over nonmembers "cannot survive without express congressional delegation," 450 U.S., at 564, 101 S. Ct., at 1258, and is therefore *not* inherent.

508 U.S. at 695 n.15 (internal citations omitted); <u>see also</u> <u>Strate v. A-1 Contractors</u>, 117 S. Ct. 1404, 1409 & n.5 (1997); <u>Montana v. Horseman</u>, 866 P.2d 1110, 1115 (Mont. 1993) (holding that Indian tribe's criminal jurisdiction over nonmember Indian

---

never decided).

-10-

was governed by status of law at time of crime and stating that "[a]lthough the <u>Duro</u> decision has been superseded by statute, the decision is still good law as it involves tribal sovereignty").

Although Congress possesses a sweeping, plenary power to regulate Indian affairs under the Indian Commerce Clause, that power remains subject to constitutional limitations.[5]  It is necessarily tempered by "judicially enforceable outer limits," including "the judiciary's duty 'to say what the law is,'" which extends to interpretation of the Constitution itself.  <u>United States v. Lopez</u>, 514 U.S. 549, 566 (1995) (quoting <u>Marbury v. Madison</u>, 1 Cranch. 137, 177 (1803)).

We conclude that ascertainment of first principles regarding the position of Indian tribes within our constitutional structure of government is a matter ultimately entrusted to the Court and thus beyond the scope of Congress's authority to alter retroactively by legislative fiat.  Fundamental, *ab initio* matters of constitutional history should not be committed to "[s]hifting legislative majorities" free to arbitrarily interpret

---

[5]<u>See, e.g.</u>, <u>Seminole Tribe of Florida v. Florida</u>, 517 U.S. 44, 72-73 (1996) (holding that Eleventh Amendment prevented Congress from authorizing suits by Indian tribes against States to enforce legislation enacted pursuant to Indian Commerce Clause); <u>Duro</u>, 495 U.S. at 693 (1990) (stating that Supreme Court precedent regarding legislative power over Indian affairs suggests "constitutional limitations even on the ability of Congress to subject American citizens to criminal proceedings before a tribunal that does not provide constitutional protections as a matter of right"); <u>Hodel v. Irving</u>, 481 U.S. 704, 712-18 (1987) (holding that congressional statute which escheated tribe members' and others' fractional interests in reservation trust lands to tribe was unconstitutional taking); <u>Delaware Tribal Business Comm. v. Weeks</u>, 430 U.S. 73, 84-85 (1977) (holding that plenary power of Congress in matters of Indian affairs is not absolute nor immune from judicial scrutiny); <u>Morton v. Mancari</u>, 417 U.S. 535, 553-55 (1974) (stating that standard for determining whether statute was appropriate exercise of authority under Indian Commerce Clause is whether it is "tied rationally to the fulfillment of Congress' unique obligation toward the Indians").

and reorder the organic law as public sentiment veers in one direction or another.  City of Boerne v. Flores, 117 S. Ct. 2157, 2168 (1997).

Prior to the post-Duro amendment, criminal jurisdiction over nonmember Indians did not exist, as it had been "necessarily surrendered by the tribes in their submission to the overriding sovereignty of the United States."  Duro, 495 U.S. at 693.  Although Congress presumably acted within its power in delegating criminal jurisdiction over nonmember Indians to the tribes, it was beyond Congress's power to declare existent a sovereignty-based jurisdiction that the Court has declared to be nonexistent.  Thus, we conclude that the post-Duro amendment to the ICRA constitutes an affirmative delegation of jurisdiction from Congress to the tribes.

## IV.

Because the power of the Winnebago Tribe to punish those who are not its members emanates solely from congressionally delegated authority, the tribal court that convicted Weaselhead and the federal court in which a second conviction is now sought to be secured do not "draw their authority to punish the offender from distinct sources of power" but from the identical source.  Heath, 474 U.S. at 88.  The dual sovereignty limitation on the constitutional protection from double jeopardy is therefore inapplicable, and the Double Jeopardy Clause bars federal prosecution of Weaselhead for the same conduct that provided the factual basis for his earlier conviction in tribal court.

The order denying Weaselhead's motion to dismiss Count III of the superseding indictment is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

As I understand it, the court is of the opinion that the determination of what sovereign powers Indian tribes inherently possess is somehow "ultimately entrusted to the [Supreme] Court and thus beyond the scope of Congress's authority to alter retroactively by legislative fiat." I respectfully disagree and cannot locate any such legal principle in the relevant cases or in the Constitution.

The court's reference to "the position of Indian tribes within our constitutional structure of government" would seem to indicate that it believes that inherent Indian sovereignty is defined by the Constitution, as would the court's reliance on Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). Indeed, it would be difficult to understand how Congress could have no power over determining the parameters of inherent tribal sovereignty unless the matter had some constitutional basis. But that is not the case.

Chief Justice Marshall, in Cherokee Nation v. Georgia, 30 U.S. (5 Peters) 1, 16-19 (1831), suggested that the question of whether an Indian tribe was a state was to be determined by reference to the uniform custom of nations and, more important, by reference to the history of our country's dealings with various Indian tribes. Indian tribes, he wrote, "have been uniformly treated as a state, from the settlement of our country . ... The acts of our government plainly recognise the Cherokee nation as a state, and the courts are bound by those acts." Id. at 16. Chief Justice Marshall made no intimation that the Constitution had anything to say on the question of whether Indian tribes are states. The Constitution is simply silent on the matter and on the related question of inherent Indian sovereignty. These are matters that are to be decided by reference to governmental custom and practice and to the general principles of the jus gentium.

-13-

In other words, the question of what powers Indian tribes inherently possess, as the district court recognized, has always been a matter of federal common law.  As a recent law review article noted, "Oliphant and Duro were not constitutional decisions; they were founded instead on federal common law."  See L. Scott Gould, The Consent Paradigm:  Tribal Sovereignty at the Millennium, 96 Colum. L. Rev. 809, 853 (1996). That being the case, Congress has the power to expand and contract the inherent sovereignty that Indian tribes possess because it has legislative authority over federal common law.

The tribal court in this case thus proceeded under an inherent sovereignty, not under one that Congress delegated, in exercising jurisdiction over Mr. Weaselhead, and the doctrine of double jeopardy would therefore not bar a further prosecution of him by the federal government.

I therefore respectfully dissent and would affirm the district court on the basis of its well-reasoned opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-