**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Rafael SANCHEZ and Luis Sanchez,**
**Defendants–Appellants.**

No. 90–5749.

United States Court of Appeals,
Eleventh Circuit.

June 4, 1993.

Roy E. Black, Black & Furci, P.A., Miami, FL, for defendants-appellants.

Dexter W. Lehtinen, U.S. Atty., Frank H. Tamen, Kathleen M. Salyer, Linda Collins Hertz, Mary K. Butler, Asst. U.S. Attys., Miami, FL, for plaintiff-appellee.

Before FAY and EDMONDSON, Circuit Judges, and HILL, Senior Circuit Judge.

HILL, Senior Circuit Judge:

Defendants/Appellants Rafael Sanchez and Luis Sanchez, father and son, were arrested in October, 1988, in South Carolina for alleged local narcotics offenses. The South Carolina charges were dropped and the Sanchezes were extradited to Puerto Rico to face charges for the events which underlie the case now on appeal.

In Puerto Rico, the Sanchezes were charged with six offenses under the Puerto Rico criminal code: destruction (P.R.Laws Ann. tit. 33 § 4334 (1989)); first degree murder (P.R.Laws Ann. tit. 33 § 4002); attempted murder (P.R.Laws Ann. tit. 33 § 3121); unlawful use of explosives (P.R.Laws Ann. tit. 25 § 586); unlawful possession of explosives (P.R.Laws Ann. tit. 25 § 587); and conspiracy to commit murder and to violate the explosives laws (P.R.Laws Ann. tit. 33 § 4523). Following a jury trial in the Superior Court in Mayaguez, Puerto Rico, Defendants/Appellants were acquitted on all counts.

Shortly thereafter, Defendants/Appellants were indicted in the Southern District of Florida, where they were charged with murder for hire (18 U.S.C. § 1958 (1989)); unlicensed transport of explosives (18 U.S.C. § 842(a)(3)); interstate transport of explosives with intent to injure or kill (18 U.S.C. § 844(d)); and flight to avoid prosecution (18 U.S.C. § 1074). Rafael Sanchez was additionally charged with interstate transport of explosives by a person charged with a criminal offense (18 U.S.C. § 841(i)(1)). Following a jury trial in the District Court for the Southern District of Florida, Defendants/Appellants were convicted on all counts. 741 F.Supp. 215 (1990).

Both defendants were sentenced to consecutive life sentences for the first three counts and five years' imprisonment on the flight count. Each sentence was followed by five years of supervised release, the terms to be

served concurrently. Rafael Sanchez was additionally fined $75,000 for transportation of explosives by a person charged with a criminal offense. Rafael and Luis Sanchez are currently incarcerated.

Defendants/Appellants filed a timely notice of appeal and now challenge their conviction on numerous grounds. We find all of their arguments on appeal to be without merit with one important exception. The claim that their prosecution in the Southern District of Florida was invalid under the Double Jeopardy Clause has some merit and warrants full discussion. For the reasons stated below, we AFFIRM in part and REVERSE in part the order of the District Court.

## I. Factual Background

In January, 1988, Rafael and Luis Sanchez resided in Tavernier, Key Largo, Florida, where Rafael owned a marina and fishing boats and ostensibly ran a lobster fishing operation. The boats were primarily used to further Appellants' marijuana and cocaine smuggling activities. Rafael Sanchez stored some of the narcotics near his home in Tavernier. Luis Sanchez would break drug shipments into marketable quantities and deliver them to distributors and customers.

Brian Williams, now deceased, worked for Rafael as a debt collector and bodyguard and shared a duplex apartment house with Luis Sanchez. Nelson Seda was Rafael's stepson-in-law and one of his customers. Seda was married to Vivian Sanchez, the daughter by a previous marriage of Carmen Sanchez, Rafael's wife.

In the summer of 1985, Seda received from the Sanchezes six ounces of cocaine, which he consumed with a friend, Alfonso Valentin. When Seda and Valentin failed to pay for the cocaine, Appellants met with Valentin and persuaded him to begin repayment. Seda apparently never paid for his share of the cocaine.

In August, 1985, Seda lost his job and began to work at Rafael Sanchez' marina. In late August or early September, 1985, using knowledge he had gained during his association with the Sanchezes, Seda went to Rafael's home and stole a wooden chest containing three kilograms of cocaine. Seda and Valentin consumed part of the cocaine and sold the remainder for $25,000.

Rafael Sanchez suspected Seda of the theft and, after Seda's initial protestation of innocence, subjected Seda and others to a polygraph examination. Seda attempted to skew the polygraph results by coughing each time he was asked about the missing chest. Rafael took no action against Seda immediately following the polygraph.

In 1986, Seda moved to Puerto Rico and dropped out of contact with Rafael and Luis Sanchez. Two years later, in May, 1988, Rafael was visiting Puerto Rico and, by chance, saw Seda. Upon returning to Florida, Rafael told his bodyguard, Brian Williams, that he had seen Seda and that he wanted Seda killed. In June, 1988, Williams approached Antonio Gonzalez, an employee at Rafael's marina, and asked Gonzalez to assist him in assassinating Seda. Gonzalez consented.

Williams and Gonzalez met with Rafael Sanchez at the latter's home, where Rafael explained that he wanted Seda killed for the theft of cocaine. Rafael told Williams and Gonzalez to fly to Puerto Rico and to check into a specified hotel close to Seda's presumed location. Rafael manifested indifference to the method of assassination and gave Williams and Gonzalez a bag containing $5,000. Rafael indicated that Gonzalez and Williams would receive additional payment after successful completion of the job.

Gonzalez and Williams then went to Luis Sanchez's residence and informed Luis that they had agreed to kill Nelson Seda. Luis gave the two a small electronic device which he described as a radio-detonated, remote controlled bomb. Luis took the device apart and demonstrated to Gonzalez and Williams the operation of the arming switch. Luis explained that the device could be detonated by remote control and he instructed Gonzalez and Williams to place the device under the seat or the gas tank of Seda's car.

On June 11, 1988, Gonzalez and Williams flew to San Juan, Puerto Rico. They concealed the bomb in a bag containing diving equipment which was checked and stored in the airplane baggage compartment. After

several days, during which time they made routine telephone reports to the United States, Gonzalez and Williams located Nelson Seda in Mayaguez. On June 19, Williams and Gonzalez drove to the street where Seda lived, parked, and waited for an opportunity to plant the bomb.

As he sat waiting, Williams toggled the unlabeled arming switch on the explosive device while trying to recall which position primed it for detonation. Unfortunately for Williams and Gonzalez, the toggling of the switch moved the mechanism controlling the detonator and the bomb exploded, killing Williams and injuring Gonzalez. Gonzalez was arrested following his release from the hospital and, shortly thereafter, began to cooperate with the Puerto Rican police and the FBI.

Shortly after the bombing accident, Luis Sanchez and a confederate, Frank Cittadini, went to the duplex Luis had shared with Williams and removed a bomb, a silenced pistol, and some gold jewelry. In mid-July of 1988, Luis and Rafael Sanchez moved to Charleston, South Carolina, where they rented a house in the name of Rafael's girlfriend, Kim Burdsall. In August, 1988, Charleston police received information that cocaine was being kept at the Sanchez/Burdsall residence. On September 29, 1988, local police and DEA agents conducted a search of the premises. As a result of this search, all the occupants of the house were arrested for possession of cocaine.

On October 11, while the Sanchezes were incarcerated in South Carolina, the FBI advised local authorities of fugitive warrants which had been issued for Rafael and Luis Sanchez by the Commonwealth of Puerto Rico. The warrants were issued for violations of Puerto Rican law stemming from the bombing incident in Mayaguez. The South Carolina charges were dropped and the Sanchezes transferred to Puerto Rican custody for indictment.

Because the nature of the Puerto Rico prosecution is essential to the disposition of this appeal, we quote at length the charges (as translated) brought by the District Attorney of Puerto Rico:

I. The district attorney brings charges ... for the crime of Violation of Article 198 of the Crim.C. (Destruction), committed as follows: ... Rafael Sanchez and Luis Sanchez, on or about the 20th day of June, 1988, and in Mayaguez, P.R., ... unlawfully, willfully, maliciously and criminally, acting in common accord and by prior agreement with Antonio A. Gonzalez Olmeda and Brian Williams, threatened the life, physical integrity and property of the residents of Alfredo Quintana Street, District of Balboa, in Mayaguez, Puerto Rico, causing the detonation of a bomb, which they unlawfully had in their possession and were carrying to the aforementioned location.

II. The district attorney brings charges ... for the crime of Violation of Article 262 of the Crim.C. (Conspiracy), committed as follows: ... Rafael Sanchez and Luis Sanchez, from the 9th to the 20th day of June, 1988, in Florida, U.S.A. and Mayaguez, P.R., ... unlawfully, willfully, maliciously and criminally conspired, along with Antonio Alfredo Gonzalez and Brian Williams, with the intent to commit murder and violate Articles 26 and 27 of Law Number 134, passed on June 28, 1969, Law on Explosives. In said conspiracy, the conspirators realized acts in order to carry out the murder of Nelson P. Seda, consisting in their bringing to Puerto Rico an explosive device in order to place and detonate the same near said person.

III. The district attorney brings charges ... for the crime of Attempted Murder, committed as follows: ... Rafael Sanchez and Luis Sanchez, on or about the 20th day of June, 1988, and in Mayaguez, Puerto Rico, ... unlawfully, willfully, criminally, and with treachery, premeditated malice, and deliberation, acting in common accord and by prior agreement with Antonio A. Gonzalez Olmeda and Brian Williams, carried out acts unequivocally aimed at causing the death of the human being Nelson P. Seda, said actions consisting in the fact that they tried to place an explosive device on the property of the aforemen-

tioned Nelson P. Seda, and said device exploded as they tried to place it, without causing the attempted death due to circumstances beyond the control of the defendants.

IV. The district attorney brings charges ... for the crime of First Degree Murder, committed as follows: ... Rafael Sanchez and Luis Sanchez, on or about the 20th day of June, 1988, and in Mayaguez, Puerto Rico, ... unlawfully, willfully, criminally, with premeditated maliciousness, acting in common accord and by prior agreement with Antonio A. Gonzalez Olmeda and Brian Williams, provoked and caused the death of the human being Brian Williams, upon perpetrating the crime of Destruction, by means of the detonation of a bomb in their possession and which they were transporting to the location of the events.

V. The district attorney brings charges ... for the crime of Violation of Article 26 of the Law on Explosives, committed as follows: ... Rafael Sanchez and Luis Sanchez, on or about the 20th day of June, 1988, and in Mayaguez, Puerto Rico, ... unlawfully, willfully, maliciously and criminally, knowingly and intentionally, acting in common accord and by prior agreement which took place in Florida, U.S.A., with Antonio Alfredo Gonzalez Olmeda and Brian Williams, used explosive substances by means of an explosive device, in order to physically injure, frighten people and destroy property. The aforementioned defendants used said material without authorization or license issued by the Superintendent of Police of Puerto Rico.

VI. The district attorney brings charges ... for the crime of Violation of Article 27 of the Law on Explosives, committed as follows: ... Rafael Sanchez and Luis Sanchez, from the 9th to the 20th day of June, 1988, in Florida, U.S.A. and in Mayaguez, Puerto Rico, ... unlawfully, willfully, maliciously and knowingly and with criminal intent, acting together and in common accord with Antonio A. Gon-

zalez Olmeda and Brian Williams, had in their possession with the intention of using it, as in fact they did use it, an explosive device, in order to physically injure, frighten people and destroy property. The aforementioned defendants had in their possession said material without authorization or license issued by the Superintendent of Police of Puerto Rico.

Following their prosecution for, and acquittal of, each of these charges in Puerto Rico, the Sanchezes were indicted in the Southern District of Florida pursuant to an ongoing investigation by federal authorities. The Florida indictment charged Appellants with murder for hire, unlicensed transport of explosives, transport of explosives with intent to injure or kill, transport of explosives by an indicted felon (Rafael), and flight to avoid prosecution. The Sanchezes were convicted on all counts and now appeal that conviction, arguing, *inter alia*,[1] that they have been placed twice in jeopardy for the same offenses in violation of the Fifth Amendment.

## II. Double Jeopardy

■ The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. While the exact scope of this clause has resisted repeated efforts at definition, it is at least well established that successive prosecutions for the same unlawful act will not offend the Constitution when they are brought under the laws of separate sovereigns. *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (upholding successive state and federal prosecutions). In *Heath v. Alabama*, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985), the Supreme Court explained this principle as follows:

[T]he dual sovereignty doctrine is founded on the commonlaw conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of

---

1. Appellants' other claims on appeal are addressed in Section III, *infra*.

each, he has committed two distinct 'offences'. *United States v Lanza*, 260 U.S. 377, 43 SCt 141, 67 LEd 314 (1922).... Consequently, when the same act transgresses the laws of two sovereigns, "it cannot truly be averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punishable." 474 U.S. at 88, 106 S.Ct. at 437, quoting *Moore v. Illinois*, 55 U.S. 13, 19, 14 L.Ed. 306 (1852).

In the instant case, the government contends that this dual sovereignty doctrine precludes application of the Double Jeopardy Clause. In other words, the government urges us to affirm the finding of the District Court [2] that Appellants' prosecution in Puerto Rico Superior Court was undertaken, not by the government of the United States, but under the authority of a separate sovereign, the Commonwealth of Puerto Rico.

The status of Puerto Rican courts [3] for the purposes of double jeopardy is a thorny issue. Application of the Double Jeopardy Clause to the facts of this case, however, presents an equally complex, and clearly constitutional, question. While we recognize that assessing the scope of the dual sovereignty doctrine necessarily involves constitutional consideration, we believe that it does not present a direct constitutional question. The purpose it serves is to forestall an un-necessary application of the Double Jeopardy Clause. As we avoid reaching constitutional questions where conflicts can be resolved on a non-constitutional basis, *see Burton v. United States*, 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482 (1905), and, in the double jeopardy context, *Whalen v. United States*, 445 U.S. 684, 702, 100 S.Ct. 1432, 1443, 63 L.Ed.2d 715 (1980) (Rehnquist, J., dissenting), we first address the applicability of the dual sovereignty doctrine to Puerto Rican courts.

### A. Dual Sovereignty Doctrine

In *Heath v. Alabama*, the Supreme Court explained that the crucial question in determining whether two prosecuting entities (in that case two states) are separate sovereigns for purposes of the Double Jeopardy Clause is whether they derive their authority to punish from distinct sources of power. *Heath, supra*, 474 U.S. at 88, 106 S.Ct. at 437. Once posed, the question was easily answered in *Heath*, for the sovereignty of the states is the touchstone of our system of federalism.[4] Thus the Court upheld separate prosecutions by Alabama and Georgia of a man whose single criminal act was the hiring of two men to kill his pregnant wife.

In its discussion of dual sovereignty, the *Heath* Court made reference to cases upholding federal and state prosecutions for the same offenses,[5] noting that "the Court has

---

2. The opinion of the district court is reproduced at 741 F.Supp. 215 (S.D.Fla.1990).

3. The court system in Puerto Rico includes a federal district court and a hierarchy of local courts. It is this set of local courts that we intend to refer to with the phrase "Puerto Rican courts". The status of the federal district court in Puerto Rico for double jeopardy purposes is unquestioned: prosecution in the United States District Court for the District of Puerto Rico clearly precludes subsequent prosecution for the same offenses in the District Court for the Southern District of Florida. The existence of a double jeopardy bar is less clear where, as here, the first prosecution took place in the Puerto Rico Superior Court, a court established pursuant to the Puerto Rico Constitution.

4. After the creation of the Union from the original thirteen states, new states have been admitted to the Union from what had theretofore been territories of the United States. Although the process may never have been formally acknowl-edged, Congress must have, at some instant, relinquished its authority over territorial lands so that the people of those lands could approach the United States as an independent entity seeking admission to the Union. The process of statehood was, then, one by which a sovereign entity made a compact with the Union to submit to the (then limited) authority of the federal government in exchange for the benefits offered in Article IV Section IV of the Constitution: that "the United States shall guarantee to every state in the Union a republican form of government, and shall protect each of them against invasion; and on application of the legislature, or of the executive (when the legislature cannot be convened) against domestic violence." The language of the Tenth Amendment, reserving "powers not delegated to the United States" to new and existing states and to the people, acknowl-edges *the reservoir of state sovereignty* which permitted formation of a federal union.

5. See *Abbate, supra,* and *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959).

uniformly held that the states are separate sovereigns with respect to the federal government because each state's power to prosecute is derived from its own 'inherent sovereignty,' not from the federal government." 474 U.S. at 89, 106 S.Ct. at 437, quoting *U.S. v. Wheeler*, 435 U.S. 313, 320 n. 14, 98 S.Ct. 1079, 1084 n. 14, 55 L.Ed.2d 303 (1978).

Early cases concerning the status of territorial courts demonstrate that territories do not possess a similar inherent sovereignty. In *Grafton v. United States*, 206 U.S. 333, 27 S.Ct. 749, 51 L.Ed. 1084 (1907), the Court held that acquittal in a court martial proceeding in the Philippines barred subsequent prosecution in Philippine trial court. The Philippine Islands were, at that time, a territory of the United States, and the Supreme Court reasoned that "the government of the Philippines owes its existence wholly to the United States, and its judicial tribunals exert all their powers by authority of the United States." 206 U.S. at 354, 27 S.Ct. at 755.[6]

■ Thirty years later, the Supreme Court applied this view of territorial courts in a case upholding the validity of a Puerto Rico antitrust law despite the coexistence of the Sherman Antitrust Act. In *Puerto Rico v. Shell Co.*, 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1937), the Supreme Court commented:

> It is ... clear that the legislative duplication gives rise to no danger of a second prosecution and conviction, or of double punishment for the same offense. The risk of double jeopardy does not exist. Both the territorial and federal laws and the courts, whether exercising federal or local jurisdiction, are creations emanating from the same sovereignty. 302 U.S. at

264, 58 S.Ct. at 172, citing *Balzac v. Puerto Rico*, 258 U.S. 298, 312, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922).

The *Shell* Court clearly found the dual sovereignty doctrine inapplicable to prosecutions in the courts of United States territories. This view is supported by Article IV of the Constitution which mandates that "the Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." U.S. Const. art. IV, § 3. Punitive authority in a territory of the United States flows directly from this plenary power. Every exercise of authority in a territory which does not proceed under a direct Congressional enactment proceeds, at least, at the sufferance of the Congress, which may override disfavored rules or institutions at will.[7] The United States Congress is the source of prosecutorial authority for both the courts of United States territories and the federal district courts. Therefore, under *Heath v. Alabama*, prosecutions in territorial courts are not protected by the dual sovereignty doctrine from application of the Double Jeopardy Clause.

■ Our inquiry does not end here, however. The Florida district court concluded that the reasoning underlying the above-quoted portion of *Puerto Rico v. Shell* was overridden by the passage of the Puerto Rico Federal Relations Act, Pub.L. 600, ch. 446, 64 Stat. 319 (1950) (codified at 48 U.S.C. § 731 *et seq.* (1989)), and, implicitly, that Puerto Rico is no longer a territory as that term was understood in the early part of this century. 741 F.Supp. at 219. We must decide, therefore, whether the creation of the Commonwealth of Puerto Rico pursuant to

---

**6.** With similar reasoning, the Court held in *Waller v. Florida*, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970), that successive prosecutions by state and municipal authorities violate the Double Jeopardy Clause.

**7.** See *Simms v. Simms*, 175 U.S. 162, 168, 20 S.Ct. 58, 60, 44 L.Ed. 115 (1899) ("In the territories of the United States, Congress has the entire dominion and sovereignty, national and local, Federal and state, and has full legislative power over all subjects upon which the legislature of a state might legislate within the state ..."); *United States v. McMillan*, 165 U.S. 504, 17 S.Ct. 395, 41 L.Ed. 805 (1897) (Congressional enact-

ment for accounting of fees by clerk of territorial court overrides territorial enactment); *El Paso & Northeast Ry. Co. v. Gutierrez*, 215 U.S. 87, 30 S.Ct. 21, 54 L.Ed. 106 (1909) (under Congress' plenary authority over territories, Federal Employers' Liability Act applies to the Territory of New Mexico despite unconstitutionality of FELA with regard to the states); *National Bank v. County of Yankton*, 101 U.S. 129, 25 L.Ed. 1046 (1880) (Congressional annulment and reenactment of statute passed in territorial legislature of South Dakota authorized local issuance of railway bonds).

the Federal Relations Act so changed the status of Puerto Rico that it must now be considered a separate sovereign for the limited purpose of the dual sovereignty exception to the Double Jeopardy Clause.

Puerto Rico was ceded to the United States by Spain in the aftermath of the Spanish American War of 1898.[8] Between 1898 and 1950, the civil government established for Puerto Rico by Congress was given increasingly independent authority over local affairs, although Puerto Rico's governor, attorney general, and supreme court justices continued to be appointed by the President of the United States. Foraker Act, ch. 191, 31 Stat. 77 (1900); Jones Act (Puerto Rico), ch. 145, 39 Stat. 951 (1917).[9] In 1917, Congress provided for a bicameral, elected legislature and an elected Commissioner to Congress, and granted United States citizenship to the residents of Puerto Rico. Jones Act, *supra*, §§ 5, 25–27, 36.

In 1950, as part of a continuing effort to promote autonomous rule in Puerto Rico, Congress passed the Puerto Rico Federal Relations Act with the stated intention of permitting the people of Puerto Rico to "organize a local government pursuant to a constitution of their own adoption." 48 U.S.C. § 731(b). The Federal Relations Act authorized the Puerto Rico legislature to call a constitutional convention and to draft a constitution for submission to the President of the United States and ratification by the United States Congress. 48 U.S.C. § 731(d). The Puerto Rico Constitution was ratified by the people of Puerto Rico in March, 1952,

and was amended and ratified by Congress shortly thereafter. Joint Res. ch. 567, 66 Stat. 327 (1952).

The First Circuit has concluded that passage of the Federal Relations Act and creation of a Puerto Rican constitution so altered the relationship between Puerto Rico and the Congress that Puerto Rico became sovereign for purposes of the dual sovereignty doctrine. In *United States v. Lopez Andino*, 831 F.2d 1164 (1st Cir.1987), *cert. denied*, 486 U.S. 1034, 108 S.Ct. 2018, 100 L.Ed.2d 605 (1988), the First Circuit relied on Supreme Court dicta stating that "Puerto Rico, like a state, is an autonomous political entity," to find that Puerto Rico is a separate sovereign under the Double Jeopardy Clause. 831 F.2d at 1168, quoting *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 8, 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982). In subsequent cases, the First Circuit has reiterated this conclusion. *United States v. Bonilla Romero*, 836 F.2d 39 (1st Cir.) *cert. denied*, 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 33 (1988); *United States v. Quinones*, 758 F.2d 40 (1st Cir.1985).

We disagree with the conclusion of the First Circuit that Congress' decision to permit self-governance in Puerto Rico makes Puerto Rico a separate sovereign for double jeopardy purposes. We are substantially in accord with Judge Torruella's concurrence in *Lopez Andino*.[10] We have referred for guidance to his discussion of the status of Puerto Rican courts and conclude, as he did, that Puerto Rico is still constitutionally a territory, and not a separate sovereign. As a terri-

---

8. Debate about the ideal status of Puerto Rico has continued, uninterrupted, since that time. The three participants in the debate are supporters of Puerto Rican statehood, supporters of Puerto Rican independence, and supporters of the status quo. *See, generally,* Jose Cabranes, *Puerto Rico: Colonialism as Constitutional Doctrine*, 100 *Harv.L.Rev.* 450 (1986). While we consider the constitutional status of Puerto Rico to be highly significant, if not dispositive, of its status under the Double Jeopardy Clause, we note that other courts, taking a less literal approach, have suggested that Puerto Rico may be "like" a state for purposes of a particular constitutional provision. *See, e.g., Mora v. Mejias*, 206 F.2d 377 (1st Cir.1953) (discussing applicability of Fourteenth Amendment rather than Fifth Amendment due process); *Fornaris v. Ridge Tool Co.*, 423 F.2d 563 (1st Cir.), *rev'd on other*

grounds, 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970) (same).

9. Provisions of each act not superseded by the Federal Relations Act of 1950, are codified at 48 U.S.C. § 731 *et seq.* (1989).

10. We note, particularly, his discussion of the legislative history of P.L. 600, 831 F.2d at 1173–74, and of recent Supreme Court cases permitting rational basis discrimination against residents of Puerto Rico in entitlement programs. 831 F.2d at 1175, citing *Califano v. Torres*, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978); *Harris v. Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980). *See also*, Juan Torruella, *The Supreme Court and Puerto Rico, The Doctrine of Separate and Unequal* (1985).

tory, Puerto Rico remains outside an exception to the Double Jeopardy Clause which is based upon dual sovereignty. The authority with which Puerto Rico brings charges as a prosecuting entity derives from the United States as sovereign.

The Supreme Court's application of the *Heath* test to prosecutions in Native American tribal courts supports our conclusion that the Federal Relations Act did not fundamentally alter Puerto Rico's relationship to the United States. In *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), decided twenty-five years after the passage of the Federal Relations Act, the Supreme Court relied on *Puerto Rico v. Shell* in *distinguishing* the dependent status of territorial courts from the separate sovereign status of Native American tribal courts.[11] The *Wheeler* Court held that the dual sovereignty exception permits federal prosecution of conduct already prosecuted in Navajo tribal court because Indian tribes are possessed of sovereignty which predates the formation of the United States:

> The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their **existing sovereign powers.** In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status. 435 U.S. at 323, 98 S.Ct. at 1086 (citations omitted) (emphasis added).

The Court described Indian tribes as separate peoples within the physical territory of the United States. *Id.* at 322, 98 S.Ct. at 1085. In contrast, the Court reiterated that "a territorial government is entirely the creation of Congress 'and its judicial tribunals exert all their powers by authority of the

United States.'" *Id.* at 321, 98 S.Ct. at 1085, quoting *Grafton v. United States*, 206 U.S. 333, 354, 27 S.Ct. 749, 755, 51 L.Ed. 1084 (1907).

The critical distinction between the Indian tribes and the Commonwealth of Puerto Rico is that none of the laws enacted to govern Indian affairs *created* Native Americans' power to govern themselves, *Wheeler*, 435 U.S. at 328, 98 S.Ct. at 1088, while the Federal Relations Act created a power of self-governance for the people of Puerto Rico. In the first area, Congress has power to extinguish existing tribal authority which it has never exercised. In the second, in order to establish a local governing structure, Congress exercised the full extent of the sovereign authority which the United States acquired from Spain.[12] As Judge Torruella emphasized in *Lopez Andino:*

> With each new organic act, first the Foraker Act in 1900, then the Jones Act in 1917, and then the Federal Relations Act in 1950 and later amendments, Congress has simply delegated more authority to Puerto Rico over local matters. But this has not changed in any way Puerto Rico's *constitutional* status as a territory, or the source of power over Puerto Rico. Congress continues to be the *ultimate source of power* pursuant to the Territory Clause of the Constitution. 831 F.2d at 1176 (Torruella, J. concurring).

The development of the Commonwealth of Puerto Rico has not given its judicial tribunals a source of punitive authority which is independent of the United States Congress and derived from an "inherent sovereignty" of the sort supporting the Supreme Court's decisions involving the states *(Heath, supra)* and Native American tribes *(Wheeler, supra)*. Congress may unilaterally repeal the Puerto Rican Constitution or the Puerto Ri-

---

11. Discussing *Heath's* focus on "the ultimate source of power" as the dispositive factor in dual sovereignty doctrine cases, the Court rejected a notion that the "extent of control exercised by one prosecuting authority over another" should govern the inquiry. As evidence that extent of control could *not* be dispositive of a dual sovereignty question, the Court noted: "Indeed, in the *Shell Co.* case the Court noted that Congress had given Puerto Rico an autonomy similar to that of

the states.... 302 U.S. at 262, 58 S.Ct. at 171." 435 U.S. at 319–320 n. 13, 98 S.Ct. at 1084.

12. The exercise of this authority is apparent, for example, in Congress' elimination of a section of the Puerto Rico Constitution prior to its ratification of the document. *See Lopez Andino*, 831 F.2d at 1174 (Torruella, J., concurring).

can Federal Relations Act [13] and replace them with any rules or regulations of its choice. Despite passage of the Federal Relations Act and the Puerto Rican Constitution, Puerto Rican courts continue to derive their authority to punish from the United States Congress and prosecutions in Puerto Rican courts do not fall within the dual sovereignty exception to the Double Jeopardy Clause. Consequently, Rafael and Luis Sanchez were twice prosecuted by the government of the United States and we turn to consider whether they were twice prosecuted for the "same offence" in violation of the Double Jeopardy Clause.

### B. Double Jeopardy Clause

#### 1. Current Law

■ While the Double Jeopardy Clause is simply worded, the language "same offence" within it has long defied definition. Double jeopardy concerns arise in two situations: where a criminal defendant is prosecuted more than once for unlawful acts occurring during the same real world event, and where, within a single prosecution, a defendant is convicted under separate statutes which have many similar elements. We refer to the first of these situations as "successive prosecution" and the second as "cumulative punishment". The constitutional concerns underlying each category of double jeopardy cases are distinct and the judiciary has consequently developed two somewhat different analyses with which to review them.

In the comparatively settled area of cumulative punishment, the primary double jeopardy question is whether Congress intended that a criminal defendant be sentenced independently for violation of each of two or more statutes. "The assumption underlying the [analysis] is that Congress ordinarily does not intend to punish the same offense under two different statutes." Whalen v. United States, 445 U.S. 684, 691–2, 100 S.Ct. 1432, 1437–8. Under the test articulated in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), we are to conclude that Congress intended cumulative punishments whenever each of two offenses charged in a single or in successive indictments requires proof of a statutory element which the other does not.[14] Once we reach this conclusion, our review comes to an end. Missouri v. Hunter, 459 U.S. at 368–69, 103 S.Ct. at 679. In these cases, the Double Jeopardy Clause ensures only that the court does not misinterpret legislative intent by imposing multiple punishments where Congress intended only one.

■ The precise reach of the Double Jeopardy Clause in successive prosecution cases has not been clearly stated, despite a wealth of recent cases and commentary. In Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the Supreme Court emphasized that the danger inherent in successive prosecutions is not misinterpretation of legislative intent but rather the possibility of an unconstitutional exercise of prosecutorial authority. Writing for the majority in Grady, Justice Brennan noted:

Successive prosecutions ... whether following acquittals or convictions, raise concerns that extend beyond merely the possibility of an enhanced sentence: 'The underlying idea ... is that the State with all its resources and power should not be able to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a

13. But cf. Quinones, 758 F.2d at 42 (authority in Puerto Rico flows from a compact, entered into in 1952 between Congress and Puerto Rico, which Congress cannot unilaterally amend); Mora v. Torres, 113 F.Supp. 309 (D.C.Puerto Rico) affd. sub nom., Mora v. Mejias, 206 F.2d 377 (1st Cir.1953).

14. This analysis has been characterized as a method of statutory construction rather than a description of a constitutional limit upon Congressional authority. Missouri v. Hunter, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983).

The Blockburger test is not a definition of the constitutional language "same offence" but rather an immensely useful method of determining legislative intent. But c.f. Missouri, 459 U.S. at 374, 103 S.Ct. at 682 (Marshall, J. dissenting) ("Since the Double Jeopardy Clause limits the power of all branches of government, including the legislature, there is no more reason to treat the [Blockburger] test as simply a rule of statutory construction in multiple-punishment cases than there would be in multiple-prosecution cases.").

continuing state of anxiety and insecurity....' *Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). Multiple prosecutions also give the State an opportunity to rehearse its presentation of proof, thus increasing the risk of an erroneous conviction.... 495 U.S. at 518, 110 S.Ct. at 2091–92 (citations omitted).

Prior to *Grady,* the Supreme Court had acknowledged two specific sets of circumstances in which this danger was sufficiently grave that the Double Jeopardy Clause mandated something more than the *Blockburger* analysis of legislative intent. First, in *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), the Court held that the Double Jeopardy Clause forbids both successive prosecution and cumulative punishment of a crime and its lesser included offenses.[15] Second, where a second prosecution requires relitigation of facts necessarily resolved in the defendant's favor in the first, we invalidate it under the common law doctrine of collateral estoppel which, we infer from the Supreme Court's decision in *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), hangs on the constitutional hook of the Double Jeopardy Clause.

In *Grady v. Corbin, supra,* the Court took *Ashe* and *Brown* as evidence of a wider class of cases in which double jeopardy analysis must extend beyond *Blockburger.* The Court recognized that, in addition to serving as a safeguard against judicial misinterpretation of legislative intent, the Double Jeopardy Clause guards against cases in which the government crosses over from enforcing its laws to wielding its prosecutorial authority as an inappropriate weapon against an individual. Under *Grady,* judicial review of a double jeopardy challenge to successive prosecutions begins with the *Blockburger* same element test. If the charges brought in successive prosecutions satisfy *Blockburger,* we are in-

structed to conduct a less-structured review to determine whether the same offense, in a constitutional sense, was the subject of both prosecutions. In this second stage, "the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution will prove conduct that constitutes an offense for which the defendant has already been prosecuted." 495 U.S. at 521, 110 S.Ct. at 2093. In other words, the government is constitutionally barred from prosecuting an individual a second time where the temptation to harass a criminal defendant through a second bite at the prosecutorial apple is likely to have been an element of prosecutorial decisionmaking: where acts held unlawful and prosecuted under one or more statutes are subsequently reprosecuted under the same or alternative statutes.

Determining *ex post* whether the "same conduct" was prosecuted in two proceedings can be a delicate task. In *Johnson v. Howard,* 963 F.2d 342 (11th Cir.1992), the most recent application of the *Grady* analysis in this circuit, we concluded that the Double Jeopardy Clause did not bar prosecution of an individual for possession of a firearm by one convicted of a crime of violence after he had pled guilty to possession of a firearm in a vehicle without a permit. Both charges arose out of a single incident and arrest. We applied the *Grady* test to the defendant's status as an unlicensed possessor of a weapon and his status as a convicted criminal. These states of being were the "conduct" made unlawful by the state; possession of a weapon by defendant Johnson was not unlawful but for either his lack of a license or his prior conviction. Because the conduct addressed by the trial differed from the conduct covered by the guilty plea, we held that the two did not offend the Double Jeopardy

---

**15.** This rule is limited in successive prosecution cases by an exception for prosecutorial due diligence, *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), *United States v. Maza,* 983 F.2d 1004 (11th Cir.1993), and is inapplicable to cases where an initial guilty plea covers only a portion of a multi-count indictment. *Ohio v. Johnson,* 467 U.S. 493, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984). In addition, the

lesser included offense rule has been held inapplicable to most complex crimes. *Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985) (no double jeopardy violation where continuing criminal enterprise prosecution followed conviction of predicate offenses); *United States v. Reed,* 980 F.2d 1568 (11th Cir. 1993).

Clause. The government has legitimate interests in licensing weapons and in addressing the heightened danger represented by a convicted felon's possession of a weapon. The Double Jeopardy Clause does not, therefore, prohibit the government from accepting a plea to further the former interest and conducting a trial to punish an individual for creating the latter danger.

Since 1990, the Supreme Court has limited *Grady* to situations in which the test it prescribes is most likely to identify instances of prosecutorial overreaching. This limitation acknowledges the high cost of burdening law enforcement with a constitutional challenge whenever all of the charges against a criminal defendant cannot be handled in a single proceeding. Where the *Grady* analysis is not likely to be predictive of improper governmental motives it has therefore been disregarded.

For example, in cases involving drug conspiracies or continuing criminal enterprises, cases generally supported by myriad predicate offenses, the sheer number of violations of the laws, the number of defendants, and the number of items of evidence may be impossible to handle in a single trip to the courthouse. In these cases of multilayered conduct, the *Grady* approach to double jeopardy may unduly hamper law enforcement without successfully isolating cases of harassment. It may, in addition, thwart the legislature's intention in enacting complex crime laws, which is to punish both substantive crimes and agreements to commit them. Accordingly, *Grady* has been held inapplicable to complex crime cases. *Garrett v. United States, supra; United States v. Gonzalez,* 921 F.2d 1530 (11th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 178, 116 L.Ed.2d 140 (1991).

The Supreme Court also recently held that a second prosecution does not violate the Double Jeopardy Clause merely because the same or similar evidence was presented in a first prosecution. *United States v. Felix,* — U.S. ——, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992). Indeed, the *Grady* Court itself rejected the notion that successive prosecutions employing the same evidence would necessarily violate the Double Jeopardy Clause. 495 U.S. at 508, 110 S.Ct. at 2084. Extend-

ing double jeopardy protection this far would, for example, nullify the accommodation between the exigencies of law enforcement and the rights of the accused represented in Fed.R.Evid. 404(b).

Given the limits placed on *Grady* since it was decided, we doubt that a literal application of its "same conduct" language is appropriate. See *Felix, supra; Johnson, supra; United States v. Calderone,* 917 F.2d 717 (2d Cir.1990) (finding of double jeopardy bar in broad reading of *Grady* vacated and remanded by Supreme Court "in light of *Felix;* " — U.S. ——, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992)); *United States v. Rivera–Feliciano,* 930 F.2d 951 (1st Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1676, 118 L.Ed.2d 394 (1992) (certiorari denied where appellate court found no double jeopardy bar in a narrow application of *Grady).* Having reviewed numerous cases in an attempt to uncover a discrete set of situations in which the Double Jeopardy Clause bars a second prosecution, we conclude that no one characteristic of that second prosecution controls.

The Double Jeopardy Clause neither prohibits successive prosecution of an individual for distinct unlawful acts within the same criminal transaction nor invalidates all uses of the same evidence in successive prosecutions. It does not forbid prosecuting an individual for two unlawful acts with similar statutory elements. The Double Jeopardy Clause prohibits twice placing an individual in jeopardy for the same offense against the sovereignty of the government. Whatever the strength of *Grady*'s actual language under current law, its purpose retains validity. Mindful of the refinements suggested by *Felix, Garrett,* and other cases, we focus on that purpose: to identify likely instances of prosecutorial harassment by defining when activities prosecuted under separate statutes improperly subject a criminal defendant to the worry and expense of a second prosecution for an affront to the peace and safety of the land for which he has already been prosecuted.

We believe that all of the facts and circumstances of a second prosecution should inform our identification of Fifth Amendment offenses. *See United States v. Maza*, 983 F.2d at 1011 (discussing fact-dependent element of double jeopardy analysis). The evidence presented in a second prosecution is not irrelevant to the analysis, and the elements of the offenses charged in successive prosecutions also play a role in our review. Prior to *Grady*, the Supreme Court endorsed a flexible approach to Double Jeopardy issues, *see, e.g., Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), and we do not believe that intervening developments in the law have undermined the wisdom of such flexibility. The absence of a specific set of factors which will control every case merely requires that we exercise judgment, the task assigned to us by Article III of the Constitution.

## 2. *Analysis*

Rafael and Luis Sanchez were charged, on the basis of compelling evidence, with an appalling crime, and acquitted on all counts in a proceeding which federal investigators had attempted to delay pending the completion of their own investigation. Federal prosecutors in the Southern District of Florida had substantial incentive to file additional charges. Faced with a jury verdict of not guilty on every crime charged under Puerto Rican law, and uncertain whether the dual sovereignty doctrine permitted a second prosecution, the government brought a second indictment in the Southern District of Florida.

While the case presented in Puerto Rico differed somewhat from the one presented (more successfully) in the Southern District, both prosecutions addressed the same criminal transaction. The indictments were obviously distinct because they were brought under separate statutory codes, and, although each of the charges brought in the Southern District of Florida would satisfy the *Blockburger* test, the fact that the statutes were enacted by wholly different legislatures deprives that result of any significance. *Blockburger* addresses the intention of a single legislature in establishing terms of punishment under separate statutes. Notwithstanding the territorial status of Puerto Rico, a comparison of Congress' intent in passing a particular statute with the intent of the Puerto Rico House of Delegates in enacting a statute with similar elements is outside the scope of *Blockburger*.

With the sole exception of the conspiracy count in Puerto Rico, these cases did not involve the multilayered conduct at issue in *Garrett, supra*. We turn, therefore, to an analysis of precisely what "conduct" was "prosecuted" in each of the Sanchezes' prosecutions. This analysis is guided by the question presented in *Grady*: whether, in order to establish an essential element of an offense charged in the Southern District of Florida, "the government [proved] conduct that constitute[d] an offense for which the defendant[s] [were already] prosecuted." *Grady, supra*, 495 U.S. at 510, 110 S.Ct. at 2087.

Appellants were charged and prosecuted in Puerto Rico for destruction, conspiracy to murder and to violate the explosives laws, attempted murder, first degree murder (for the death of Brian Williams), unlawful use of explosives and unlawful possession of explosives. They were prosecuted in the United States for unlicensed transport of explosives, interstate transport of explosives with intent to injure or kill, murder for hire, and flight to avoid prosecution.[16] Rafael Sanchez was additionally charged with interstate transport of explosives by a person charged with a criminal offense. We examine, in turn, each of the four United States charges upon which Appellants base their double jeopardy claim.

### a. *Unlicensed Transport of Explosives*

■ The instruction given in the Florida District Court on 18 U.S.C. § 842(a)(3) charged the jury to weigh whether the government had shown that Appellants 1). were

---

**16.** Appellants concede that their conviction for flight to avoid prosecution does not violate the Double Jeopardy Clause and we agree that this count of the United States indictment supports no constitutional challenge. In no sense were Appellants prosecuted in Puerto Rico for relocating to South Carolina after the bungled assassination attempt.

not licensed explosives dealers; and 2). had knowingly and willfully caused explosives to be transported in interstate commerce. This charge does not encompass the same activity prosecuted under Articles 26 and 27 of the Puerto Rico Law on Explosives. The Puerto Rico explosives charges addressed Appellants' vicarious responsibility for the bomb once it reached Puerto Rico.[17] Neither the unlawful use nor the unlawful possession of explosives prosecuted in Puerto Rico addresses the transportation, in interstate commerce or otherwise, of the explosive device. The United States conviction properly holds Appellants responsible for endangering lives by placing a bomb aboard a commercial airliner.

A comparison of indictments is not dispositive of double jeopardy analysis. To a certain extent, however, indictments reveal the behavior which is the underlying offense against society and the government's motive for criminalization. The government has criminalized the danger to the public created by unlicensed[18] possession, by unlicensed transportation[19] and by unlicensed detonation of an explosive device. Deterrence and punishment of each increasingly dangerous activity supports a separate offense.

The only count prosecuted in Puerto Rico which implicates Appellants' responsibility for transportation of the explosive device to Puerto Rico is the conspiracy count. The Puerto Rico indictment lists as an overt act supporting the conspiracy "bringing to Puerto Rico an explosive device." The behavior targeted by the conspiracy charge was Appellants' unlawful agreement, evidence of which was supplied by proof of the predicate transportation offense. It is well-settled that prosecution for a predicate offense prior or subsequent to a prosecution for conspiracy does not offend the Double Jeopardy Clause. *United States v. Felix, supra.* The conspiracy was properly charged as a violation of the Puerto Rican criminal code and unlicensed transportation of the bomb to Puerto Rico was properly prosecuted as a violation of the Congressionally-enacted criminal bar.

For the foregoing reasons, we AFFIRM Appellants' conviction of 18 U.S.C. §§ 842(a)(2), Unlicensed Transport of Explosives.

### b. Interstate Transport of Explosives with Intent to Injure or Kill

■ The jury instruction concerning unlawful transportation of explosives under 18 U.S.C. § 844(d) listed the following requirements: that the jury find that Rafael and Luis Sanchez knowingly and willfully caused an explosive device to be transported in interstate commerce with knowledge and intent that it be used to kill Nelson Seda and to damage a vehicle.

Appellants do not argue that their conviction of unlicensed transport and their conviction of interstate transport with intent to injure or kill, both charged in the Southern District of Florida, must fall under the Double Jeopardy Clause, and we believe that such a claim could not succeed.[20] As with

---

17. Had the assassination attempt occurred in one of the states, state law would have addressed possession and detonation at the place of the explosion and the Appellants would presumably have been prosecuted under federal law for any interstate transport of the device. This shared federal and state responsibility underscores that possession, use and interstate transport of explosives are separate offenses. This distinction is not altered where, as here, all three charges are brought by a single sovereign.

18. Because we find in Part I that Puerto Rico and the United States are the same sovereign, the licensing elements of the Puerto Rico and the United States explosives charges are parallel. Our conclusion that the behavior targeted in each charge is separate for double jeopardy purposes is not undermined by the existence of common statutory elements.

19. The movement of the detonating mechanism which caused the bomb to explode prematurely might have occurred when the bag of diving equipment in which it was concealed was loaded and unloaded by airline baggage handlers.

20. Our analysis in *Johnson v. Howard, supra,* would dispose of any such challenge. In *Johnson,* because the defendant's possession of a weapon was lawful but for either his status as a convicted felon or his lack of a license, each status supported an independent offense within the meaning of the Fifth Amendment. Similarly, Appellants' causing explosives to be transported in interstate commerce was not *per se* unlawful; it was unlawful because of the transporters' lack of a license and because of the intent with which

unlicensed transport, the transportation focus of the § 844(d) charge differentiates it from the unlawful acts prosecuted in Puerto Rico: the unlicensed possession and use of that item. The transport of explosives with intent to injure or kill does not address the same conduct as Articles 26 and 27 of the Puerto Rico Law on Explosives.

Under the circumstances of this case, the § 844(d) charge most closely resembles the charge of attempted murder, not the other explosives charges. Both § 844(d) and attempted murder focus on the inchoate stages of murder, the assembling of materials and initial steps toward the death of another. Under Puerto Rico law, attempt is a crime which must be supported by an overt act. P.R.Laws Ann. tit. 33 § 3121 ("An attempt shall exist when the person commits acts or makes omissions unequivocally directed to the execution of an offense...."). Had Puerto Rican authorities relied upon interstate transport of explosives as the overt act of the attempt charge, subsequent prosecution of the appellants might well have run afoul of the Double Jeopardy Clause. In this case, however, Rafael and Luis were charged with attempted murder because of the placement and accidental detonation of a bomb near Seda's home. The Puerto Rico charge reads:

> Rafael and Luis Sanchez ... carried out acts unequivocally aimed at causing the death of the human being Nelson P. Seda, such acts consisting in the fact that they tried to place an explosive device on the property of the aforementioned Nelson P. Seda, and said device exploded as they tried to place it, without causing the attempted death due to circumstances beyond the control of the defendants.

The conduct addressed in the attempted murder prosecution was the actual bungled assassination attempt. Other than this charge, and the detonation charge under Article 26 of the Law on Explosives, Appellants were not prosecuted for this culmination stage of their plan; instead, they were charged only with possessing and detonating the bomb without proper licensing and

charged with murder for the death of Brian Williams. The Double Jeopardy Clause does not forbid holding criminal defendants responsible, in separate prosecutions, for distinct stages of a single criminal enterprise. The murder and explosives charges necessarily resemble one another closely because they relate to a single assassination attempt, carried out through a single medium. This similarity of charges cannot, however, detract from the fact that Appellants committed a number of unlawful acts and may be punished for each of those acts, subject only to the dictates of the Constitution. Because we find that the conduct prosecuted as attempted murder in Puerto Rico differed from the conduct prosecuted in Florida as interstate transport of explosives with intent to injure or kill, we AFFIRM Appellants' conviction under 18 U.S.C. § 844(d).

c. *Interstate Transport of Explosives by a Person Charged with a Criminal Offense*

■ The jury instruction regarding 18 U.S.C. § 842(i)(*l*) charged the jurors to find Rafael Sanchez guilty if they found that he knowingly and willfully caused explosives to be transported in interstate commerce after having been charged with a narcotics offense punishable by more than one year in prison. At the time of the assassination attempt, Rafael Sanchez was under indictment for trafficking in marijuana and conspiracy to traffic in marijuana.

None of the Puerto Rico charges incorporated Rafael Sanchez' prior criminal activities. The transport of explosives by an individual already implicated in serious criminal activity raises heightened public safety concerns and is a separate offense, separately punishable, from unlicensed use or possession. Prosecution of Rafael Sanchez under § 842(i)(*l*) does not offend the Double Jeopardy Clause and we AFFIRM the judgment of conviction.

d. *Murder for Hire*

■ The jury instruction concerning murder for hire listed the three findings of

---

the explosives were introduced into interstate commerce. Though the transport of the bomb

was but a single real world event, it supported at least these two offenses.

fact necessary to support a guilty verdict under 18 U.S.C. § 1958: that Rafael and Luis Sanchez 1). knowingly and willfully caused Brian Williams and Tony Gonzalez to travel from Florida to Puerto Rico; 2). with the intent that Nelson Seda be murdered; 3). as consideration for a promise to pay.

Rafael and Luis Sanchez' responsibility for the attempted murder of Nelson Seda rests on their meetings with, and instructions to, Brian Williams and Tony Gonzalez. Rafael broached the subject of assassination with Williams, Williams recruited Gonzalez, Rafael gave general instructions and provided payment, and Luis supplied the explosive device and operating instructions. Appellants' responsibility for Williams' and Gonzalez' actions from the moment the latter two packed their bags for Puerto Rico flows to Rafael and Luis through these meetings and instructions.

Under the charge of attempted murder, Puerto Rico's District Attorney prosecuted Appellants for "willfully ... and by prior agreement with Tony Gonzalez and Brian Williams ... carr[ying] out acts unequivocally aimed at causing the death of ... Nelson P. Seda." Under the murder for hire count, the government prosecuted Appellants for "willfully caus[ing] Brian Williams and Tony Gonzalez to travel from Florida to Puerto Rico with the intent that Nelson Seda be murdered." This count of the indictment so approximates the Puerto Rico attempted murder charge that it cannot stand. The offense against peace and safety that is the subject of both charges is Appellants' recruitment of third parties to commit a willful and premeditated murder.

We do not suggest that a criminal defendant cannot be prosecuted for both attempted murder and murder for hire. We merely find that, under the circumstances of this case, the government prosecuted Appellants for the offense of hiring Williams and Gonzalez to murder Seda through the statutory mechanism of Puerto Rico's prohibition of attempted murder and that it could not legitimately prosecute them again for that recruitment under the federal murder for hire law.

The Puerto Rico charge does rest on a "common accord and prior agreement" between the parties rather than the "promise to pay" supporting the murder for hire count. Here, however, the "common accord", which was developed during the meeting at Rafael's home, was cemented by the transfer of money and included in its scope the promise of future payment. Again, the statutory labels differ but the conduct is the same. A semantic distinction cannot cure a double jeopardy violation, particularly where, as here, the statutes were enacted by separate legislatures.

We REVERSE the judgment of conviction for murder for hire under 18 U.S.C. § 1958.

### III. Other Claims on Appeal

Appellants offer nine additional challenges to their convictions in the Southern District of Florida. We have reviewed each of these claims and find that none merit reversal of the judgment below. Although these claims are moot with regard to the conviction which we have found invalid under the Double Jeopardy Clause, we address them to the extent that they affect the remaining convictions.

### A. Testimony of Government Informant Daniel Giron

▉ Daniel Giron, a witness critical to the government's case, testified to inculpatory statements made by Rafael and Luis Sanchez while the three were incarcerated in a Puerto Rican jail. Giron had worked as an informant for the FBI until his incarceration for violation of probation. At the time Appellants made the statements at issue, they were under indictment in Puerto Rico, but not yet in the Southern District of Florida.[21]

---

21. Because the dual sovereignty exception is inapplicable to Puerto Rico, Appellants were under

indictment for Sixth Amendment purposes and the Supreme Court's decision in *Illinois v. Per-*

Appellants claimed at trial and now claim on appeal that Giron's testimony should have been suppressed because he acted as a government agent and elicited the statements in violation of Appellants' Sixth Amendment right to counsel.

At trial, the court heard the testimony of Giron's FBI supervisor, George Nabovny, that Giron was terminated as a federal informant upon his arrest for violation of probation. Giron was reactivated as an informant after he approached Nabovny with evidence of Appellants' incriminating statements. Concerned about potential Sixth Amendment implications, the trial judge conducted an *in camera* examination of Giron's testimony. Having weighed Agent Nabovny's testimony, the court concluded that Giron was not a government informant at the time the incriminating statements were made and that the Sixth Amendment did not require exclusion of the testimony. The court reconsidered this Sixth Amendment claim in Defendants/Appellants' post-trial motion for new trial and reached the same conclusion. We find no error in the court's conclusion that Daniel Giron was a terminated informant during the period in which the challenged conversations occurred.

### B. *"Drug Evidence"*

 Appellants object to the admission at trial of prosecution testimony concerning the operation of their narcotics trafficking operation. Specifically, Appellants claim that the references to narcotics activity made by Gonzalez, Seda, Frank Cittadini, FBI agent Andre Fortier, and Brian Williams' girlfriend Katherine Lillo, transformed the proceeding into a "drug trial" and "prejudiced the jury." Under Fed.R.Evid. 404(b), evidence of prior bad acts is admissible where it tends to show the motive or intention of the accused to commit the offense charged. The district court did not err in finding that this evidence was relevant to Appellants' involvement in

*kins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) does not govern our analysis of this

the murder attempt and that its probative value was not outweighed by prejudice.

### C. *Government's Failure to Furnish Allegedly Exculpatory Evidence*

Appellants allege that the government failed to provide them with two items of exculpatory evidence prior to trial: 1). the prior conviction record of witness Daniel Giron and information about alleged benefits he received in exchange for his testimony; and 2). an alarm clock purchased by Williams and Gonzalez in Puerto Rico. In his order denying Appellants' Motion for New Trial, the trial judge found that both items of evidence were available to defense counsel prior to trial. We find no error in this determination.

### D. *"Inflammatory" Evidence*

 Appellants claim that they were denied the right to a fair trial by the introduction at trial of the following evidence: 1). photographs of the scene of the explosion; 2). an expert's demonstration of the operation of the bomb with a replica of the device and a flashbulb; and 3). the government's references to the risk that the bomb could have exploded while aboard the commercial airliner. Under Fed.R.Evid. 403, a trial judge may exclude otherwise relevant evidence when its probative value is substantially outweighed by the danger of jury confusion, prejudice, or needless presentation of cumulative evidence. *United States v. Tidwell,* 559 F.2d 262 (5th Cir.1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978). In this case, the district judge elected not to exercise his discretion to exclude this relevant evidence at trial. We find no abuse of that discretion.

### E. *Exclusion of Puerto Rico Acquittal*

 Appellants argue that they should have been permitted to introduce evidence of their acquittal in Puerto Rico Superior Court at trial in Florida. Evidence of a judgment of acquittal is generally inadmissible because it is hearsay and not covered by any exception to the rule against hearsay. *United States v. Irvin,* 787 F.2d 1506 (11th Cir.1986).

issue.

We find no error in the district court's conclusion that proof of the prior proceeding should not be admitted because it might confuse the jury where the charges brought and evidence presented in Puerto Rico were not identical to those in the Florida trial.

### F. Sufficiency of the Evidence

▮ Appellants contend that the evidence adduced at the Florida trial was legally insufficient for their convictions of murder for hire, flight to avoid prosecution and the offenses connected with interstate transportation of explosives. In evaluating a claim of legal insufficiency, we interpret the evidence and the reasonable inferences to be drawn from it in the light most favorable to the government. *United States v. Sanchez,* 722 F.2d 1501, 1505 (11th Cir.), *cert. denied, Gonzalez v. United States,* 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984). Having reviewed the trial transcript, we are satisfied that the government presented substantial evidence from which the jury could conclude beyond a reasonable doubt that Appellants committed the offenses charged.

### G. Application of the Federal Sentencing Guidelines

Appellants challenge the calculation of their base offense level under the Federal Sentencing Guidelines. Specifically, they claim that the district court erroneously determined that murder was the appropriate underlying offense of counts I and IV, murder for hire and interstate transportation of explosives with intent to kill. Because we reverse Appellants' conviction of murder for hire, we need not reach the Guidelines claim which relates to that conviction.

▮ We find no error in the district court's use of first degree murder as an underlying offense of interstate transportation of explosives with intent to injure or kill.

The Guidelines permit a court to impose a sentence based upon relevant offense conduct even where the defendant has been acquitted of the specific charge alleging such conduct. *United States v. Averi,* 922 F.2d 765, 766 (11th Cir.1991); *United States v. Funt,* 896 F.2d 1288, 1300 (11th Cir.1990). The court could not and did not sentence Appellants for murder. In choosing a sentence within the range provided under the Guidelines, the court properly considered the death that occurred as a direct result of Appellants' unlawful transportation of explosives. Contrary to Appellants' contention, the court could properly conclude that the underlying unlawful conduct violated either 18 U.S.C. § 1111 or Section 782.04, Florida Statutes (1988), the applicable federal and state murder laws. No error flows from the court's application of the Sentencing Guidelines.

### H. Remaining Claims

Finally, we dismiss without discussion Appellants' claims of error in 1). the prosecutor's comment during closing about the inapplicability of the death penalty; and 2). the introduction of evidence that Rafael had Nelson Seda undergo a polygraph examination after the cocaine theft. We find these claims to be without merit.

The judgment of conviction is AFFIRMED in part and REVERSED in part and is remanded for proceedings not inconsistent with this opinion.

EDMONDSON, Circuit Judge, concurs in the result.